## Choate v. Commonwealth.

(Decided June 19, 1917.)

### Appeal from Graves Circuit Court.

1. Criminal Law—Verdict of Jury Arrived at by Lot.—Section 271 of the Criminal Code provides that if a verdict has been decided by lot, the court may grant a new trial, if the verdict is prejudicial to the substantial rights of the defendant. Verdicts by lot are not approved, but unless a verdict so found is prejudicial to the substantial rights of the defendant, it will not be reversible error.

2. Criminal Law—Verdict of Jury Arrived at by Lot.—Where the jury, after all agreeing that the defendant was guilty, further agreed that each should set down on paper the sentence, and that the sum of the numbers should be divided by twelve, and the quotient be returned as the verdict, and after the quotient was ascertained each juror individually voted that to be his verdict, the manner of making the verdict was not prejudicial to the substantial rights of the accused.

3. Criminal Law—Incompetent Evidence Must Be Prejudicial to Substantial Rights of Accused to be Reversible Error.—On the trial of a defendant charged with the crime of mayhem, committed by castrating a person charged with intimacy with his wife, the admission of evidence for the Commonwealth, tending to show that an undue intimacy existed between the defendant and another woman, was incompetent, but not prejudicial.

4. Criminal Law—Evidence of Other Offenses Incompetent.—It is not proper to inquire of a defendant concerning other offenses committed by him, unless it is necessary to establish identity, or guilty knowledge, or intent or motive for the crime, or unless they be so interwoven with it as that it cannot be separated from them, or the independent offense was perpetrated to conceal the crime.

5. Criminal Law—Judgments Will Not Be Reversed For Error Unless It Prejudices the Substantial Rights of the Accused.—Under section 340 of the Criminal Code this court will not reverse judgments in criminal cases for error of any kind unless it appears to this court after examining the record that the alleged error was prejudicial to the substantial rights of the accused.

6.  Criminal Law—Insanity—Evidence That Accused Had Informa-
    tion Prior to Killing of Infidelity of Wife.—On the trial of an
    accused for homicide, when the defense is insanity in the form
    of an irresistible impulse produced by the receipt of information
    of the infidelity of his wife, it is competent for him to give in
    evidence every fact and circumstance that came to his knowl-
    edge prior to the killing, tending to show the intimacy between
    the person killed and his wife.

7.  Criminal Law—Insanity—Evidence That Accused Had Informa-
    tion Subsequent to Killing of Infidelity of Wife.—But it is not
    competent for him to introduce evidence of witnesses who would
    say that they saw acts of intimacy between the person killed
    and his wife, of which he had no information before the killing,
    or to prove that the information he received was true.

ROBBINS & ROBBINS, H. J. MOORMAN and HOLIFIELD &
McDONALD for appellant.

M. M. LOGAN, Attorney General, and OVERTON S. HOGAN, As-
sistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The grand jury of Graves county returned an indict-
ment under section 1165 of the Kentucky Statutes, against
the appellant, B. E. Choate, charging that he, "before
the finding of this indictment, did unlawfully, willfully,
feloniously, maliciously and with force and arms, and
by placing Henry Campbell in fear, and with a sharp-
edged instrument, cut and slit off a member of the person
of Henry Campbell, to-wit, a part of the privates of
Henry Campbell." Under this indictment Choate was
put upon his trial, and the jury, after finding him guilty,
fixed his punishment at confinement in the state peniten-
tiary for a period of 3 years and 4 months. From the
judgment entered on the verdict, Choate prosecutes this
appeal and asks a reversal on several grounds that will
be noticed in the course of the opinion.

The crime committed by Choate was cruel and un-
natural in the extreme, and was committed after careful
preparation and mature deliberation. Admitting the
commission of the crime, he sought to excuse himself
upon the ground that information he had received that
Campbell at different times and various places had de-
bauched his wife, had affected his mind to such an extent
that at the time of the act he was without sufficient rea-
son to know what he was doing or to know right from
wrong, and did not have sufficient will power to govern
his actions by reason of an insane impulse which he
could not resist or control.

Having admitted the commission of the crime, and his only defense being insanity, it will be seen that the issues for the jury to determine were confined to the investigation of two questions: First, had Choate received information shortly before the commission of the crime that Campbell had been criminally intimate with his wife; and, second, if he had, did this information affect his mind to such an extent as to render him legally irresponsible for his conduct?

It would serve no useful purpose to relate the evidence except so far as may be necessary to present the grounds relied on for a reversal. Sufficient is it to say that Choate and Campbell were neighbors, living about a mile and a half apart, and that until June, 1916, the relations between them and their families had been cordial and friendly, if not intimate. Choate had been married about fifteen years, and, so far as the record shows, no children had been born of the marriage. About five years after their marriage his wife became subject to what the witnesses describe as "spells" or a form of epilepsy, and these attacks continued at intervals from that time until July, 1916. It further appears that the relations between Choate and his wife were at all times, until June, 1916, perfectly agreeable and such as might exist in any well-ordered family.

Choate testifies that about June 14, 1916, his wife confessed to him that on several occasions and at different places, including his own home and the house of Campbell, she and Campbell had been guilty of adultery, each time at the insistence and solicitation of Campbell; that he did not take seriously all she said, because her mind, on account of the epileptic attacks to which she was subject, was sometimes unsettled, and he thought perhaps the story she told him had its origin in one of the hallucinations under which she at times labored; but that it made sufficient impression to cause him to be suspicious to such an extent that he conveyed the information to his brother and requested him to observe the conduct of Campbell and his wife; that a few days after this his brother told him that he had seen Campbell and his wife commit twice in the stable loft the act of adultery, and that his wife shortly afterwards again confessed her guilt; that on Saturday, July 15, he again discovered that his wife had been criminally intimate with Campbell and again she confessed her guilt; that on this Saturday he was away from home and received a message that his wife was about to commit suicide, and upon

hurrying home found her afflicted with one of the spells she was accustomed to having, and took from her bosom a note which she had written to her husband and friends indicating that she was going to take her life; that on the following Monday, July 17th, he wrote out a short statement, which his wife signed, reciting that she had had sexual intercourse twice on July 15th, as well as on other different occasions with Campbell; that on the next day, Tuesday morning, he concluded to leave her, and did so, going to Mayfield, the county seat of Graves county, at which place he sold a considerable amount of property that he owned, and stayed all night in the hotel in the little town of Wingo, not far from his residence; that on Wednesday morning he got in his buggy and rode to Campbell's house, called him out to the road and compelled him by threats of violence to get in his buggy with him and they drove down the road; that as he drove he told Campbell the information he had received as to his intimacy with his wife, naming times and places, and that he intended to either kill or castrate him as he preferred; that Campbell said he was not ready to die; that after driving about two hundred yards from Campbell's house, he put handcuffs on Campbell and forced him to get out of the buggy and lie down in the road; that after performing the operation, he drove off, leaving Campbell in the road.

It might be noticed here that there is no dispute about the fact that Choate had with him the handcuffs, which he had procured for the purpose he used them from a Chicago house a short time before, and a pistol, as well as the knife that he used, and that Campbell, who was not expecting a visit from Choate, did not know his purpose in calling him out to the road, where he compelled him to get in the buggy by threatening to kill him if he did not.

Choate further testified that the information received from his wife and his brother caused him great mental pain and suffering, and disturbed his mind to such an extent that he was unable to control himself or resist the impulse to either kill or maim Campbell; that his first impulse was to kill him, and he would have pursued this course except he remembered having read in the Bible that no murderer should ever enter the Kingdom of Heaven, and so he changed his mind and decided to emasculate him.

Other witnesses also testified that for some days before July 19 Choate's mental as well as physical condi-

tion was so changed as to attract attention and some medical experts expressed the opinion that he was not accountable for his act.

On the other hand, a number of witnesses said they did not discover any change in his appearance or conduct, and it is not denied that on Tuesday, the day before the crime was committed, he was capable of attending to and did have some important business transactions.

Upon the whole, the evidence of his insanity is not satisfactory, and the verdict of the jury demonstrates that they did not take seriously his evidence or that of the witnesses who testified in his behalf on this subject. But, however this may be, the issue was submitted to the jury under appropriate instructions and they discarded his plea.

At this point it is convenient to say that Campbell denied positively that he had ever been criminally intimate with or guilty of any impropriety with Mrs. Choate at any time or place or in any manner.

One of the grounds urged for reversal is that the jury arrived at their verdict by lot in violation of section 271 of the Criminal Code, providing that "If the verdict have been decided by lot, or in any other manner than by a fair expression of opinion by the jurors" the court "may grant a new trial, if a verdict be rendered against the defendant by which his substantial rights have been prejudiced." Seven of the jurors filed like affidavits setting out that "after every member of the jury had arrived at the conclusion that the defendant was guilty as charged in the indictment, they then discovered that the twelve jurors who tried the case differed materially as to the punishment to be inflicted, and for the purpose of reaching a verdict, they each entered into an agreement that each juror would set down on a paper the number of years of confinement in the state penitentiary that he thought the defendant should receive as punishment for his crime, and that the sum of these numbers set down on paper by each of the jurors should be divided by twelve and the quotient so found by said division should be returned into court as the verdict of said jury. That pursuant to said agreement, they each set down upon paper the number of years he thought the defendant should receive and the sum of said numbers was added by one of the jury and divided by twelve, and the result was three years and four months; and the jury, in accordance with their previous agreement that the verdict should de-

pend upon the result of said calculation, returned into court in said case a verdict directing the confinement of the defendant, B. E. Choate, in the penitentiary for three years and four months.

Five of the jurors joined in another affidavit agreeing in substance that the verdict was arrived at in the manner stated in the other affidavits, but this affidavit contained the additional statement that after the result had been ascertained by dividing the total sentences fixed by all the jurors by twelve, and it was ascertained that the sentence would be three years and four months, a vote was taken "and each juror voted for the time to be three years and four months by a rising vote."

It will be observed that in the affidavits made by the seven jurors it is not recited that after the result was ascertained by the system adopted, each individual juror agreed to the sentence, and in view of this omission we may assume the fact to be as stated in the affidavit joined in by the five jurors. In addition to this the jury was polled in open court and each answered that the verdict was his.

This identical question was before us in the late case of Bennett v. Com., 175 Ky. 540, and in holding that the fact that a verdict arrived at by this method would not justify a reversal, the court, speaking through Chief Justice Settle, said: "It satisfactorily appears from the affidavits of the jurors that each of them agreed upon appellant's guilt before determining the punishment that should be given him, and though the method of fixing the punishment ascertained by the mathematical calculation was agreed to by the jury before the calculation was made, the agreement was in fact again made by the jury, after the calculation, that the punishment indicated by the verdict be adopted independently of the method referred to. In other words, the result reached by the method employed was fully assented to and agreed upon by each juror as if the method had not been employed. . . . And it does not appear from the affidavits or from the figures themselves that there was any fraud or chicanery practiced or trick resorted to upon the part of any juror in bringing about the result arrived at; nor does it appear that any juror did or said anything to improperly influence any other juror. . . .

"We would not be understood as approving the practice of juries arriving at a decision or verdict by lot. Upon the contrary, we regard such a practice as highly reprehensible and at all times to be condemned; but we

do mean to say that as it appears in this case that not-withstanding the figuring done by the jury, the verdict they arrived at appears to have fairly expressed the opinion entertained by each juror, and that by unanimous agreement it was subsequently adopted by them, no in-justice was done the appellant thereby or by the refusal of the circuit court to grant him a new trial because thereof.''

Supplementary to what is said in that opinion, it may further be noticed that although section 271 of the code authorizes the granting of a new trial when the verdict has been arrived at by lot, the granting of a new trial for this cause is a matter within the discretion of the trial court and consequently a matter of discretion with this court, because the section expressly provides that it shall only be a ground for a new trial when it appears that the substantial rights of the defendant have been prejudiced by this method of determining the sentence; so that before either the trial court or this court would be justified in setting aside a verdict upon this ground, it should appear from the record that the substantial rights of the accused were prejudiced by the action of the jury, and we are well satisfied that the substantial rights of Choate were not prejudiced by the manner in which the jury agreed on his term of imprisonment.

Another assignment of error is that the court per-mitted the jury to hear incompetent and prejudicial evi-dence introduced by the Commonwealth over the objec-tions and exceptions of the defendant.

The facts as to this alleged incompetent evidence are these: It appears that a Mrs. Dunning had been living at the home of Choate, doing housework there for several months just prior to July 19, 1916. On his cross-examina-tion, Choate was asked by counsel for the Commonwealth:

''Q. Now, I will ask you if it is not a fact that you had been making preparations to leave your wife and run off with this Mrs. Dunning? A. No, sir, that is not a fact. Q. I will ask you if it is not a fact that you knew your wife was jealous of Mrs. Dunning and had expressed her-self to you as being jealous of her? A. No, sir. Q. I will ask you if it is not a fact that on one occasion when your wife and Mrs. Dunning were in a fuss, something about a cap, that you came in and took Mrs. Dunning's part in that fuss? A. No, sir. Q. I will ask you if it is not a fact that your wife told you in the presence of Mrs. Dunning that if you did not stop that, that she was going to kill herself? A. I don't remember that; I don't remem-

ber any such conversation as that whatever. Q. I will ask you if on Tuesday morning, in the presence of your wife, you did not pay Mrs. Dunning $75.00 before you left there? A. I did. Q. I will ask you if you did not go and open your grip and take out $200 and give it to Mrs. Dunning and then after that give her $75.00 extra? A. No, I went into the grip and got out $200.00 and give it to Minnie. Q. Now, from the time that you left your wife until the time you committed this act, how many times had you seen Mrs. Dunning? A. I saw her the time she brought me the watch, then I saw her in the store, and that is the only two times that I remember. Q. Now, I will ask you if it is not a fact that you and Mrs. Dunning were frequently alone at different places where nobody lived, in different houses? A. No, sir. Sometimes Minnie would send her after me. Q. Is it not a fact that you and Mrs. Dunning were seen out at secret places alone at all times of the night? A. No, sir. Q. Now, I will ask you if it is not a fact that you and Mrs. Dunning went over to the Kitt's place and remained there as late as ten o'clock at night and nobody lived there at the Kitt's place? A. No, sir.''

Other like questions were asked for the purpose of further developing the relations that existed between Choate and Mrs. Dunning, and some of these questions were answered in the affirmative, others in the negative, and to others again the response was, ''I don't remember.''

We have set out this matter quite fully in order that the question as to its competency and alleged prejudicial nature may be clearly presented, and so that there may be no misunderstanding as to our views. Some of the questions asked Choate concerning interviews with Mrs. Dunning and visits and trips in company with Mrs. Dunning between June 14th and June 19th were admissible upon the issue as to the mental condition of Choate, but many of the questions that we set forth were both irrelevant and incompetent. They did not have connection with the issues in the case or serve to throw any light on the subject under investigation which concerned only the mental condition of Choate, and it was error on the part of the court to permit the Commonwealth's attorney to ask these questions and to require the defendant, over the objection of his counsel, to answer them. Saylor v. Com., 97 Ky. 184; Gargill v. Com., 12 Ky. L. R. 149; Shepherd v. Com., 119 Ky. 931; Morse v. Com., 129 Ky. 294; Baker

v. Com, 106 Ky. 212; Com. v. Welch, 111 Ky. 530; Watson v. Com., 132 Ky. 46.

In the cases cited, as well as in many others, this court has said that it was not proper to inquire of the defendant, when he offered himself as a witness in his own behalf, concerning other offenses committed by him, and in a number of cases inquiries of this nature have been deemed sufficient grounds for reversal on account of the probable prejudicial effect upon the minds of the jury. Plainly, the commission of other offenses by the defendant should not be inquired into unless, as said in Morse v. Com., *supra,* "It is necessary to establish identity, or guilty knowledge, or intent or motive for the crime under trial, or be so interwoven with it that it cannot be well separated from it in the introduction of relevant and competent evidence, or the independent offense was perpetrated to conceal the crime for which the accused is on trial."

In the case we have, however, Choate was not inquired of concerning any other criminal offense that he might have committed or concerning any criminal charge with which he might have been connected. The inquiries did not go to this extent, but only had a tendency to show that possibly the relations between Choate and Mrs. Dunning were too intimate; and it is probable that the introduction of this evidence created in the minds of the jury the impression that Choate was more attentive to Mrs. Dunning than he should have been.

But, admitting all this, the question remains, did this line of irrelevant evidence prejudice his substantial rights? That all of it, except such parts as tended to show his mental condition was incompetent and should have been excluded, may readily be admitted. But the admission of incompetent or irrelevant evidence is not in and of itself reversible error. It must further clearly appear, to us from an inspection of the entire record, that its admission was prejudicial to the substantial rights of the defendant before a reversal will follow. It is so provided in section 340 of the Criminal Code as amended in 1880, reading: "A judgment of conviction shall be reversed for any error of law appearing on the record when, upon a consideration of the whole case, the court is satisfied that the substantial rights of the defendant have been prejudiced thereby."

In considering this section, so important in the correct administration of the criminal law, we said in Hargis v. Com., 135 Ky. 578, in refusing a reversal which was

sought on the ground that evidence admittedly competent had been rejected, that "Section 340 of the Criminal Code of Practice originally read as follows: 'A judgment of conviction shall be reversed for any error of law appearing on the record.' Under this provision many criminal cases were reversed by this court, and so, the better to promote the administration of justice, the legislature added to the section these words: 'Whenever upon consideration of the whole case the court is satisfied that the substantial rights of the defendant have been prejudiced thereby.' The plain purpose of the amendment was to provide that a judgment of conviction should not be reversed unless upon a consideration of the whole case the court was satisfied that the substantial rights of the defendant had been prejudiced by the error complained of. This has been the rule for a long time under the Civil Code, and the purpose of the amendment was to make the rule in criminal cases practically the same as in civil cases. Under the former provision, the court was required to reverse when it found an error in the record. It was not allowed to speculate as to what was the effect of the error. The amendment was aimed to change this rule and to provide that no case shall be reversed where the defendant has had substantially a fair trial of the merits of his case. We have in a number of cases so construed the amendment."

It was also said in Parrish v. Com., 136 Ky. 77: "We have more than once announced that it is not every error that will authorize a reversal. Our jurisdiction is altogether a creature of the statute and the law that gives us jurisdiction declares, in section 340 of the Criminal Code of Practice, that a judgment of conviction shall only be reversed for error of law 'appearing on the record, when upon consideration of the whole case the court is satisfied that the substantial rights of the defendant have been prejudiced thereby.' Therefore, when a person who has been convicted of crime appeals to this court, he must be able to affirmatively show errors of law that have prejudiced his substantial rights, and these errors must appear to us to be of sufficient importance to direct a new trial.

"The presumption of innocence that protects the accused ends when a judgment of conviction is entered against him in the trial court. On appeal we must and do assume that his trial was regular, and that his guilt was duly established before the tribunal created by law for the purpose of inquiring into it." To the same effect

are Henson v. Com., 139 Ky. 173; Cavanaugh v. Com., 172 Ky. 799; Renaker v. Com., 172 Ky. 714, and many other cases.

Again, in Overstreet v. Com., 147 Ky. 471, we said: "We may also observe that it would be a rare thing in the trial of an important and hotly contested case if errors of law could not be found in the record, judged by strict legal standards. But every judge and lawyer who has had experience in the trial of criminal cases knows that a great many of these errors do not at all prejudice or affect the substantial rights of the accused. The basic rule of our system of criminal pleading and practice is that every person accused of crime has the right to demand and have a fair trial, in substance as well as in form; and when he has had such a trial before the tribunal created by law for that purpose, which under our practice is a trial judge and a jury, he must abide by the decision, unless it be that his substantial rights have in some manner been prejudiced. There is no right of appeal guaranteed by the constitution, but the legislature has given the accused who is convicted the right of appeal, and has conferred upon this court the right to review the trial in which he was convicted. But, in conferring this right of review, the legislature by the amendment before noticed, invested this court as a final arbiter between the Commonwealth and the accused with wide discretion, and this discretion puts upon us large power and responsibility, leaving it to our judgment to say for what errors there shall be a reversal. Having this view of the jurisdiction and authority of this court in criminal cases, it is our invariable practice to carefully consider the whole record in every criminal case that comes before us and to endeavor to determine from such consideration whether or not errors relied on for reversal were of such a character as to prejudice the substantial rights of the accused. If they were, we feel it our duty to remand the case for a new trial; if they were not, we likewise feel it our duty to affirm the judgment. We may also notice that these rules which control us in the disposition of criminal cases are not confined to any particular error or class of errors. The code provision applies to and embraces all errors assigned without regard to what part of the proceedings or trial they occur in. Every error relied on whatever it may consist of is to be subjected to the test: 'Did it prejudice the substantial rights of the accused?' If it did, a new trial will be ordered; if it did not, an affirmance will follow."

Applying now the wholesome principle announced in these and many other cases to the matter in hand the inquiry recurs did the admission of this incompetent as well as irrelevant evidence prejudice the substantial rights of Choate or prevent him from having a fair trial in form as well as in substance, to which every person accused of crime is entitled? We think not. A careful reading of the entire record and the well prepared brief of his counsel, taken in connection with the verdict of the jury, convinces us that this evidence was not prejudicial to the substantial rights of Choate. He admitted the commission of the crime. His only excuse was insanity. In view of this admission the jury of course had no difficulty in reaching the conclusion that he was guilty and should be punished, unless his plea of insanity was sufficient to save him from the consequences of his act, and his relations with Mrs. Dunning, as shown by the incompetent and irrelevant evidence, could not and did not affect or weaken the value of the evidence in support of his only defense. He may have been guilty of the grossest immorality with Mrs. Dunning, but evidence of this fact would not have a tendency to show that he was mentally capable of appreciating the nature and quality of the crime he committed, or that he did have sufficient will power to resist the evil impulse. And then, too, when we look at the verdict of the jury we find that the penalty imposed was not the maximum, as his punishment could have been fixed at five years in the penitentiary.

It is further contended that the court erred in refusing to permit certain witnesses to describe to the jury the lewd and adulterous conduct which it was avowed they would testify they saw Campbell and Mrs. Choate engaged in. The court permitted Choate to relate every fact and circumstance showing the illicit relations between Campbell and his wife that were conveyed to him before the act by his wife, his brother and other witnesses; and also permitted his brother to detail on the witness stand all the facts in connection with this matter which he saw and that he had before the crime told to Choate, but refused to permit him to say that the information he conveyed to his brother was true, and also refused to allow Choate to introduce the evidence it was alleged one Perry and other witnesses would give of other acts of improper intimacy between Campbell and Mrs. Choate witnessed by them, but which they had not communicated to Choate before the commission of the crime.

It will be seen from this that the specific errors complained of are the refusal of the trial court to permit Perry and other witnesses to testify that at various times and places they saw Campbell and Mrs. Choate in compromising situations and engaged in acts of adultery, and the refusal of the court to allow the brother of Choate to testify that what he told him had actually occurred in his presence. No information concerning any of the acts or conduct offered to be proven by these witnesses other than his brother had been communicated to Choate prior to the crime, nor did he at that time have any knowledge or information as to what these witnesses other than his brother knew or would say. The ground upon which the competency of this rejected evidence is urged is that it would corroborate the declarations of Choate, that he had received the information concerning the misconduct of his wife and Campbell, which he related on the witness stand, and would have weakened if not destroyed the arguments of attorneys for the Commonwealth that there was no foundation in fact for the charges made by Choate against the chastity of his wife.

In other jurisdictions there is some conflict in the authorities on the subject of the admissibility of evidence of this character, but this court, in Shipp v. Com., 124 Ky. 643, took the position, and as we think the correct one, that it was not permissible to introduce the character of evidence offered and rejected in this case. In that case Shipp on his trial for the murder of Smith sought to excuse his act upon the ground that Smith had been unduly intimate with his wife and that information of this nature conveyed to him had so affected his mind as to render him legally irresponsible for what he did. On the trial of the case Shipp was permitted to testify that a short time before he killed Smith, his wife confessed to him her illicit relations with Smith. He also offered to prove by other witnesses that his wife had confessed her guilt to them, but these witnesses had not, before the crime, communicated to Shipp the information received from his wife; and the court held that it was properly excluded upon the ground that as Smith did not know of the confession, they could have had no effect or influence upon his mind at the time of the homicide. The Commonwealth in that case was also permitted to show by a number of witnesses that the reputation of Mrs. Smith for virtue and chastity was good, and the admissibility of this evidence was sought to be sustained upon the ground that unless permitted to show her good reputa-

tion, the Commonwealth had no means of establishing the fact that the charge made by her husband was false; but this court said that the evidence was incompetent.

In cases where the defendant seeks an acquittal upon the sole ground of unsoundness of mind caused by information received by him before the act that his wife had been criminally intimate with the person he was charged with killing, it is admissible to permit him to relate information of every fact and circumstance conveyed to him shortly before the act, or of which he had personal knowledge, tending to show the illicit relations of his wife with the person he killed, for the purpose of illustrating his state of mind at the time the killing occurred. McCandless v. Com., 170 Ky. 301; Shepherd v. Com., 119 Ky. 931. If the defendant received such information and believed it to be true, it is wholly immaterial, so far as its effect upon him is concerned, whether it was, in fact, true or false. And so in this case it was not the truth or falsity of the information Choate received before the act that upset his mind, but the fact that he believed it to be true, and that it was of such a nature as to naturally and reasonably disturb his mental equilibrium.

This character of evidence is of course hearsay, and, generally speaking and in ordinary cases, would be entirely incompetent. But when the defense is insanity, or such an irresistible, insane impulse as would in law excuse the act, the defendant ought in reason to be allowed to show how and why his mind was affected and the causes that produced the condition. And so it is generally held that evidence of information conveyed to the defendant by others, or obtained through his personal observation shortly before the act, is admissible if it is of such a nature as to naturally and reasonably affect his mental poise to an extent that it would render him irresponsible while acting under its influence. But if before the act the defendant has not received any information, or there has not been communicated to him any fact or circumstance that would have a tendency to affect his mental poise it is plain that subsequent communications or information should not be heard to excuse what he did. This proposition, on the face of it, is so simple as not to need elaboration. How could Choate excuse himself for the crime that he committed by showing that after it had been committed he received information that might have excused its commission or mitigated its gravity if it had been known to him before? How could what Perry

or other witnesses may have known about the intimacy between Campbell and Mrs. Choate have in any manner or form affected the mind of Choate, when he was totally ignorant of what they knew?

But it is said in some of the cases from other jurisdictions, that proof of acts of infidelity, not communicated to the defendant until after the commission of the crime, should be permitted to go to the jury for the purpose of corroborating the truth of the information received by him before the crime was committed and upon which he acted. The fault in this argument is that it ignores the essential fact that so far as the effect of the information upon the mind of the defendant is concerned, it is wholly immaterial whether the information he received was false or true. It is not the fact that the things actually occurred, or the truth of their existence, that affected his mind, but the fact that he believed, and had a right to believe, from information received, that the things related to him did happen.

But, aside from this, if Choate had been allowed to show on his trial by different witnesses that at various times and places they had seen acts of improper intimacy between his wife and Campbell, of which he knew nothing until after the killing, it would have brought into the case collateral issues having no direct relation to the matter under investigation, and thus the minds of the jury would have been diverted from the issues involved in the trial to an inquiry as to the truth or falsity of a dozen different offenses alleged to have been committed by Mrs. Choate and Campbell. The result of this would have been that the time of the court would have been taken up and the minds of the jury turned aside from the case on trial to a consideration of these alleged offenses.

There is a material difference between the development of information received by the defendant before the commission of the act and information of a similar nature received by him after its commission. Prior communications are permissible in evidence, but subsequent ones are not, and the Commonwealth will not be allowed to show that the information received by the defendant before the act was false, or that there was no foundation in fact for the rumors conveyed to him, for the reason that he had the right to act on the faith of things that to him at the time appeared to be true and to have existence in fact, regardless of whether they were, in fact, true or not. Under this rule the inquiry on this subject

is confined to an investigation of the information in possession of the defendant before the act, and its probable effect on his mind, and the jury are not confused by hearing a lot of evidence that might be introduced touching wholly irrelevant matter as they would be if subsequent information were permitted to be introduced in evidence. We are, therefore, of the opinion that the court properly refused to permit the offered evidence to be heard.

The final assigned error brought to our attention is the alleged misconduct of counsel for the Commonwealth in the statement of the case, as well as in the closing argument.

So far as the statement of counsel for the Commonwealth in opening the case is concerned, it might be disposed of by the comment that, in stating what the Commonwealth proposes to show, counsel may briefly direct the attention of the jury to all the facts and circumstances that counsel in good faith believe will be allowable to develop in the evidence. Of course, it may quite often happen that counsel in the statement of the case will refer to facts and circumstances concerning which the trial court will not permit evidence to be heard. But this is unavoidable, because counsel cannot always know in advance what evidence will be allowed to go to the jury. But in all cases the court should give attention to opening statements and endeavor to confine counsel to such limits as the evidence will be permitted to embrace. We have read the statement made by counsel embodied in the bill of exceptions, and also the alleged improper argument, and although counsel went outside of the record in the particulars called to our attention, the court admonished the jury not to consider the statements made by counsel, as there was no evidence to support them.

It should be added that an instruction offered by counsel for Choate was refused, and we think correctly so, because the instructions given covered the whole case.

Although it appears that some errors were committed during the trial, a careful inspection of the record satisfies us that no error prejudicial to the substantial rights of the accused was committed by the trial court or the jury, and therefore the judgment is affirmed.