## Blackerby v. Commonwealth.

(Decided November 13, 1923.)

### Appeal from Jefferson Circuit Court (Criminal Division).

1. Homicide—Improper Relations Between Defendant's Wife and Decedent Without Notice to Defendant Inadmissible.—In a prosecution for homicide, where evidence that deceased maintained improper relations with defendant's wife is offered to show motive, provocation, or emotional insanity, it is necessary to show that notice thereof was communicated to defendant before the homicide.

2. Homicide—Intimacy Between Defendant's Wife and Decedent Admissible Under Plea of Self-Defense.—In a prosecution for homicide, where evidence of intimacy between deceased and defendant's wife is offered in support of a plea of self-defense, communication of the fact of intimacy is not a prerequisite to its admission.

3. Homicide—Exclusion of Testimony Concerning Acts Which Defendant was Permitted to Detail May be Prejudicial.—The exclusion of evidence of unbiased witnesses of intimacy between defendant's wife and decedent may be prejudicial, though defendant was permitted to detail conversations between his wife and decedent, tending to show their relations were unduly intimate.

4. Criminal Law—Requiring Defendant to Detail Assault Made Years Before Alleged Offense Held Error.—Where, in a prosecution for homicide, defendant merely testified as to a conversation which he heard between his wife and decedent in which his wife stated that defendant would do no more to decedent if they ever met than he did to another man, requiring defendant to testify as to the details of an assault which he made on the man referred to about six years before the homicide, held error.

5. Criminal Law—Circumstances Stated Under which Offenses Other than Alleged Offense Considered.—The commission by accused of offenses other than the alleged offense should not be inquired into unless it is necessary to establish identity, criminal knowledge, intent, or motive of accused, or the other offenses are so in-

separably connected with the alleged offense as to form but one transaction, or were perpetrated to conceal or enable accused to commit the crime charged.

6. Homicide—Prior Written Statement Admissible to Impeach Credibility of Dying Declaration.—In a prosecution for homicide, decedent's prior written statement is admissible to impeach the credibility of his dying declaration. .

7. Criminal Law—Whole Statement Admissible, Part having been Admitted to Impeach Dying Declaration.—Where part of decedent"s prior written statement was admitted to impeach the credibility of his dying declaration, the whole of that statement is admissible.

8. Witnesses—Generally, Whole Statement Admissible, Part having been Admitted to Impeach Credibility.—Generally, where a party seeks to impeach a witness by the introduction of a portion of a former conversation, statement, or deposition, the opposing party may introduce all of it.

9. Criminal Law—Methods of Raising Question of Failure to Admonish Jury as to Effect of Impeaching Evidence.—The question of the court's failure to admonish the jury as to the effect of impeaching evidence may be raised by motion to admonish, by objection and exception to the introduction of evidence, or by a motion to exclude.

10. Homicide—Statement Made Under Sense of Impending Dissolution Admissible.—A statement made by deceased under a sense of impending dissolution is admissible.

11. Criminal Law—Ruling as to Selection of Jury Panel Not Reviewable.—The court's ruling as to the selection of the jury panel is not reviewable, in view of Criminal Code of Practice, section 281.

JAS. P. EDWARDS and DAVID R. CASTLEMAN for appellant.

THOS. B. McGREGOR, Attorney General, LILBURN PHELPS, Assistant Attorney General, JOSEPH S. LAWTON, Commonwealth's Attorney, FRANK M. DRAKE and W. CLARKE OTTE, Assistant Commonwealth's Attorneys, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Reversing.

Appellant, who was indicted for the murder of C. E. Heavrin, was found guilty of manslaughter and his punishment fixed at confinement in the state reformatory for a period of twenty-one years.

The case, as presented by appellant, may be summarized as follows: Appellant and his wife had resided in Louisville for about sixteen years. He was in the tobacco business, and up to within a short time of the homicide she was in charge of the linen department of Herman, Straus & Sons Company, and had accumulated an estate

worth several thousand dollars. During the summer of 1922 they lived together in a small apartment on the south side of Fourth street. Up to that time they had lived together without serious friction, but in the month of October he and his wife had a disagreement, and during the discussion he agreed that she might have a divorce if she would stick to the truth and not seek alimony from him. After that, however, they continued to live together until a week later, when he came home and found her moving out of the apartment to another room in the same house. He claims that he tried to persuade her not to leave him, but to no avail. Later on, he was served with a summons in a divorce suit. He seems to have been worried because the petition not only asked for a divorce but for all proper relief, and consulted a lawyer, who told him that this was the usual prayer in such cases. He not only tried to bring about a reconciliation, but went to the judge of the court in which the suit was pending and asked him to hold up the case during his efforts for a reconciliation. This the judge consented to do, although he had already decided to grant the divorce. However, he did not inform appellant of his decision. Appellant claims that at times he was encouraged in the hope that his wife would abandon her action, but in the end she always refused to make up. Because of this change in her attitude, he became convinced that someone was influencing her, and finally decided to tap the telephone wire leading into her room. This he did about five days before the tragedy, and soon began to hear conversations between her and some man. During these conversations they addressed each other as "dearest" and "darling," made engagements to meet each other, discussed appellant as her "ex," talked of certain incidents that had taken place and, in referring to one of them, she stated that if appellant had known of it, it would be, "Katie, bar the door," with the divorce suit. In one of these conversations she and the man discussed what appellant would do if he met the man. She said in substance that appellant would do no more than curse him, as he had done to another man who had shown her some attention several years before. The man to whom she was talking said that he was perfectly capable of taking care of himself, and did not feel any uneasiness about meeting appellant. On Friday before the homicide appellant placed in his overcoat pocket an automatic pistol which he found at his

place of business in the desk of his partner. Having heard his wife and the man make an appointment to meet at the Seelbach Hotel on Friday night at nine o'clock, he decided to go there. When he arrived he saw the man and his wife together, and realized that he was a stranger. On Saturday he overheard his wife call a telephone number, and after investigation found the telephone called was in the office of Dr. C. E. Heavrin, a dentist, who had offices on Market street, not far from Herman, Straus & Sons Company. On Saturday afternoon he decided to go see Dr. Heavrin on the pretext of having his teeth cleaned. When he reached the office it was locked, and he found no signs of life. He then started down the steps, and when about half way down, the doctor came out of his office and asked to know his business. He told him that he was looking for Dr. Heavrin to clean his teeth. The doctor replied that he was Dr. Heavrin, but he had quit work for the day. At that time appellant had his pistol in his pocket, but made no effort to use it. That night he learned by means of the telephone that his wife was in the doctor's office when he called there, and stayed until just before nine o'clock, when she went to Herman, Straus & Sons Company, where she was formerly employed, and arranged her hair. Numerous other conversations took place on Sunday, as well as on Monday, the day of the tragedy. About 2:30 Monday afternoon he again went to Heavrin's office and found the door locked. Later on he went to a restaurant across the street and called Heavrin's office. His wife answered the phone, only to be followed immediately by Heavrin. Appellant stated that he wanted to have his teeth cleaned. Heavrin told him to come in half an hour. Appellant stationed himself in the restaurant across the street where he had a full view of the building containing Heavrin's office. While there he saw the muslin curtains pulled apart, as though someone were looking out. Shortly thereafter he saw his wife step out on Market street. With this he crossed the street and told her that he wanted her to go back to the doctor's office. She protested and refused to go. Catching hold of her arm, he placed her in front of him and proceeded up the steps. When they reached the top of the steps, Heavrin was standing in the hall on the left side of the door. Heavrin said, "What are you doing here?" Appellant replied, "I came up here to talk to you and my wife." With

that Heavrin sprang at appellant, striking him in the breast.    Appellant then put his hand in his overcoat pocket and took out his revolver for self-protection. Heavrin grabbed the pistol, and during the scuffle there was fired one shot which struck Heavrin and caused his death a few days later.    It was further shown that the shell that was fired was not ejected, and that this could have resulted if Heavrin had grabbed the pistol and wrestled for it, as appellant claimed he did.

On the other hand, the Commonwealth introduced the following dying declaration of the deceased:

"Two ladies were in *my* — office and one started to pay her bill with a twenty dollar bill and that Mrs. Blackerby who was there to have one of her teeth looked at changed the money for *them* and the lady that I — examined, —— Mrs. Blackerby's tooth, after which she went down the steps, and only been gone a very short time just long enough to reach the sidewalk when I heard much noise on the steps and walked to the door.   As I reached the door the man and Mrs. Blackerby were there, and the man said, '*I got you*' and shot me.   I tried to get the gun but I could not get it.

"Question: Did you try to hurt or fight him   Answer: No."

This was followed by evidence showing the conduct of the parties after the homicide, and particularly the fact that appellant made no effort to call a physician, and admitted that he had shot the deceased.

Appellant was permitted to show that in a previous statement made by the deceased, but which was rejected as a dying declaration, he was asked and answered the following questions: "Q.   Did you have any controversy with him before he shot you?   A.   Yes, I made a grab for the gun, but it went off before I could wrestle it from him.   Q.   Then you scuffled with him?   A.   Yes."

Relying not only upon the evidence which he had introduced, but upon appellant's account of the tragedy, it was the contention of the Commonwealth that appellant, acting from jealousy, deliberately armed himself and went to the office of Dr. Heavrin for the purpose of killing him and did kill him.   On the other hand, it was the contention of appellant that he had seen Heavrin two or three times before the homicide and made no attempt to kill him, but on the occasion in question he went to Heavrin's office in company with his wife for the purpose of

demanding an explanation, that when he stated his purpose to Heavrin, Heavrin struck him, and he then drew his pistol in self-protection, that Heavrin grabbed the pistol and during the scuffle the pistol was accidentally discharged.

The principal ground urged for reversal was the refusal of the court to admit evidence of the relations which existed between Dr. Heavrin and Mrs. Blackerby. We need not repeat the offered evidence. It is sufficient to say that some of the evidence tended to show that the doctor and Mrs. Blackerby were in love with each other, while other portions tended to show that an undue intimacy existed between them, and that the doctor was jealous of another man who knew Mrs. Blackerby. It is insisted that this evidence was properly rejected because none of it was ever communicated to appellant before the homicide.    When evidence that the deceased maintained improper relations with the wife of the accused is offered by the Commonwealth to show motive, or by the accused to support a plea of emotional insanity or to prove provocation, it becomes necessary to inquire whether or not the fact of intimacy was communicated to the accused before the homicide, for unless communicated, it would not operate as a motive for his act or in anywise affect his mental condition (Shipp v. Comth., 124 Ky. 643, 99 S. W. 945, 10 L. R. A. (N. S.) 335); but when evidence of such intimacy is offered in support of the plea of self-defense, the communication of the fact of intimacy is not a prerequisite to its admission, and the reason for the rule is that such evidence, like uncommunicated threats, shows the deceased's state of mind toward the accused, and thereby renders more probable the claim that the deceased was the aggressor. That this is the natural effect of such evidence there can be no doubt.    One who has become enamored of or unduly intimate with the wife of another and has caused her to take steps to procure a divorce is much more apt to entertain a feeling of jealousy and hostility toward her husband and to anticipate an attack at his hands and take the initiative in order to avoid the consequences than one whose relations with the wife are altogether proper.    The facts of this case well illustrate the rule.    Had Dr. Heavrin's relations with Mrs. Blackerby been only those of a dentist and patient, he would have been wholly free from any feeling of jealousy, hostility or fear that he would have

prompted him to make the first attack, and had such a case been presented to the jury it would have been difficult for them to believe that appellant's account of the homicide was true.   But let us suppose that Dr. Heavrin was enamored of or unduly intimate with appellant's wife, that appellant appeared with his wife and asked for an explanation, and that Dr. Heavrin had theretofore boasted of his ability to take care of himself in case of an attack by appellant, would it not have been the natural thing for him to resent appellant's presence and get in the first blow, not only for self-protection, but to demonstrate to Mrs. Blackerby that he was superior in courage and strength to the man whom he had supplanted in her affections?   As the evidence of what occurred at the time of the homicide was conflicting, we conclude that the offered evidence should have been admitted to enable the jury to determine who was the aggressor in the light of deceased's state of feeling towards accused and its probable effect on his conduct.   Gafford v. State, 122 Ala. 54, 25 So. 10; Downs v. State, 93 So. 76; Reigell v. State, 62 So. 977 (Ala.) ; Moorman v. State, 69 So. (Miss.) 1000. But it is insisted that the exclusion of the evidence was not prejudical, as appellant was permitted to detail conversations alleged to have occurred between his wife and the deceased, and which tended to show that their relations were unduly intimate.   The difficulty with this view is that the jury may not have believed appellant, but would have been inclined to believe unbiased witnesses who testified to circumstances indicating that an undue intimacy actually existed.

As before stated, appellant testified in chief that he overheard a conversation between his wife and the deceased, in which the deceased asked what appellant would do if he met the deceased, and his wife replied that he would do no more than curse him as he had done to another man who had shown her some attention several years before.   On cross-examination, appellant was compelled over his objection to testify that about six and one-half years before he had gone into a theatre and found his wife with a man whom he afterwards followed out of the theatre and cursed because of his attentions to his wife, and to state numerous other details connected with the transaction.   It will be observed that appellant did not himself testify to the transaction in question, but only stated that the transaction was referred to in

the conversation which he claimed to have overheard between his wife and the deceased. The only effect of the evidence, therefore, was to bring to the attention of the jury the fact that at a time far remote from the homicide he was guilty of assaulting another man because of his attentions to his wife. The commission of other offenses by the accused, even though of the same sort, should not be inquired into under familiar rules of evidence, unless it be necessary because of peculiar circumstances to establish identity, criminal knowledge, intent or motive of accused, or the other offenses be so inseparably connected with the crime charged as to form but one transaction, or were perpetrated to conceal or enable the accused to commit, the crime charged. Bullington v. Commonwealth, 193 Ky. 530, 236 S. W. 961. As this case does not fall within any of the exceptions to the rule that evidence of other crimes is not admissible, it cannot be doubted that the court erred in not excluding the evidence complained of. Brashear v. Comth., 178 Ky. 492, 199 S. W. 21; Choate v. Comth., 176 Ky. 427, 195 S. W. 1080.

The deceased made two written statements in regard to the homicide, one on the night of December 18th, and one on December 23rd. The latter was admitted as a dying declaration, but the former was excluded on the ground that it was not made under a sense of impending dissolution. After the second statement was admitted, appellant was permitted to introduce a portion of the first statement for the purpose of impeachment, a practice which is sanctioned in this state. Tolliver v. Comth., 161 Ky. 81, 170 S. W. 515; Beaty v. Comth., 140 Ky. 230, 130 S. W. 1107. Thereupon the court permitted the Commonwealth to introduce the whole of the first statement. This is complained of on the ground that the portion so admitted was self-serving and related to circumstances not strictly a part of the *res gestae*. With the exception that, in the case of dying declarations, it is not necessary, because impossible, to lay a predicate for the admission of inconsistent statements, we perceive no reason for any distinction between the impeachment of a declarant and the impeachment of any other witness. It is the general rule in this country that where a party seeks to impeach a witness by the introduction of a portion of a former conversation, statement or deposition, the opposing party may then introduce the whole of the former conversation, statement or deposition. Wilhelmi v. Leonard, 13 La.

335; Lowe v. State, 97 Ga. 792, 25 S. E. 676. The reason for the rule is that it affords a simpler test and avoids a continuous and petty wrangle over the various parts of the conversation or deposition, and the possible disadvantage of introducing some irrelevant matter may well be borne by the party who provoked the result by attempting to introduce a fragmentary portion. Wigmore on Evidence, vol. 2, section 1045. Though some portions of the first statement did not relate strictly to the *res gestae*, the entire statement was relevant and material to the issue to be tried, and we are clearly of the opinion that its admission as a whole was proper in the circumstances.

In two or three instances the court permitted witnesses to be impeached by evidence of contradictory statements without limiting the effect of the evidence. Though in each instance there was an objection and an exception to the testimony, it is insisted that the question was not properly raised because appellant did not request the court to admonish the jury. There is apparent authority for this position, Bennett v. Commonwealth, 175 Ky. 540, 194 S. W. 797, but when the numerous cases are considered in the light of their facts, it will be found that in a criminal case the question of the court's failure to admonish the jury as to the effect of impeaching evidence may be raised not only by a motion to admonish, but by objection and exception to the introduction of the evidence or a motion to exclude. McDaniel v. Comth., 185 Ky., 608, 215 S. W. 544; Day v. Comth., 173 Ky. 269, 191 S. W. 105; Wright v. Comth., 155 Ky. 750, 160 S. W. 476; Copley v. Comth., 184 Ky. 185, 211 S. W. 558. It follows that the error is reviewable and adds weight to the other errors above discussed, for all of which the judgment should be reversed.

A careful consideration of all the attendant circumstances convinces us that the second dying statement of the deceased was made under a sense of impending dissolution and was properly admitted in evidence.

The instruction on accidental killing is complained of on the ground that it is too abstract in form. While it cannot be said that the instruction was in anywise prejudicial to appellant, we conclude that it is the better practice to give a more concrete instruction, and to that end the form set out in section 754, Hobson, Blain & Caldwell's Instructions to Juries, is commended.

We find no error in instruction No. 7.

It is next insisted that the jury panel was not selected according to law, but in view of section 281, Criminal Code, the court's ruling on that matter is not reviewable. Harris v. Comth., 163 Ky. 781, 174 S. W. 476; Deaton v. Comth., 157 Ky. 308, 163 S. W. 204.

Judgment reversed and cause remanded for new trial consistent with this opinion.

Whole court sitting, Chief Justice Sampson dissenting in a separate opinion.

### Dissenting Opinion by Chief Justice Sampson.

I cannot agree with the conclusion reached in the majority opinion reversing the judgment. I therefore dissent.

The few slight errors occurring at the trial and pointed out and made the basis for the majority opinion reversing the judgment were not and could not have been, it seems to me, prejudicial to the substantial rights of appellant; and this court, by section 353, Criminal Code, is only authorized to reverse a judgment of conviction in a criminal case when it is satisfied from a review of the whole case that the substantial rights of appellant have been prejudiced by the errors of which complaint is made, and not in any other case. Murphy v. Commonwealth, 1st Metcalfe 365; Robinson v. Commonwealth, 16 B. Mon. 609; Hoskins v. Commonwealth, 188 Ky. 80; Montford v. Commonwealth, 196 Ky. 780; Scott v. Commonwealth, 198 Ky. 714.

In such a long trial where a very large record is built up, including volumes of evidence, rulings of the court and avowals, declarations and exceptions of counsel, it would be strange indeed if no error was committed. We seldom find such a record, but we frequently find records in which no errors of importance are noted, and on such appeals the judgment is affirmed.

To my mind, appellant by his conduct in arming himself and lying in wait for the deceased, in approaching his estranged wife and forcing her against her will to go with him to the office of deceased for the purpose of accosting if not assaulting deceased, not only sought the difficulty but precipitated and brought it about and was wholly responsible for the trouble which resulted in the death of Dr. Heavrin. This being so he surrendered his right of self-defense.

His only other defense is in effect based largely upon what is commonly called the unwritten law, which is no defense at all. For one, I am tired of such atrocious murderers evading the just penalties of the law upon such flimsy excuses.

The majority opinion in all other respects is well prepared, and I dissent only because I regard the errors found in the record as too insignificant and unimportant to warrant a reversal of the judgment of the Jefferson circuit court. I believe appellant had a fair and impartial trial and received an exceedingly low penalty at the hands of the jury, the facts considered.