## Slaughter v. Commonwealth.

(Decided June 11, 1912.)

### Appeal from Christian Circuit Court.

Criminal Law—Improper Argument.—The attorney for the Commonwealth should not seek by reckless or extravagant statements to inflame the mind of the jury against the accused, but should confine his argument to the facts and circumstances developed on the trial of the case, and such fair inferences as may be drawn therefrom. Under no circumstances should he comment upon what this or that person would have testified to if his evidence could have been obtained by the Commonwealth.

LINTON & CLARK for appellant.

JAMES GARNETT, Attorney General, D. O. MYATT, Assistant Attorney General and C. H. BUSH for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellant, Slaughter, prosecutes this appeal, asking a reversal of a judgment of the Christian Circuit Court imposing the death penalty. Three grounds are relied on: First, the failure of the court to grant a continuance; second, improper argument of the Commonwealth's Attorney; and third, that the verdict upon which the judgment was rendered was not supported by the evidence.

The facts are few and simple. The appellant is a negro boy about 19 years old, and on February 4, 1912,

he shot and killed L. A. Jenkins, a white man about 48 years of age. The homicide occurred on Sunday afternoon in the little town of Edgoten, in a store in which Jenkins was clerking. It appears that Slaughter, in company with three other colored boys, went to the store to get a guitar string that Slaughter wanted to buy. After purchasing the guitar string, Slaughter asked Jenkins to sell him a dime's worth of cheese. Jenkins went behind the counter for the purpose of cutting the cheese, and when he had cut it, the trouble commenced. Stark Leavell, one of the boys who accompanied Slaughter to the store and who was introduced as a witness for the Commonwealth, testified that Slaughter said "he would be G— d— if that was a dime's worth of cheese," and that when he made use of this expression he had his hand on his pistol in his back pocket. He also testified that immediately after Slaughter spoke, Jenkins stepped from behind the counter and struck him, knocking him down on the counter or a box or the floor; whereupon Slaughter drew his pistol and shot Jenkins twice.

In a dying declaration, Jenkins said: "I sold him (Slaughter) a guitar string; when he called for ten cents' worth of cheese, I cut it off for him; he said it wasn't ten cents' worth; I told him it was; he called me a d— liar, and I struck at him; and then he shot me, firing three shots at me." All of the other witnesses who testified as to what occurred, said that Jenkins struck Slaughter and knocked him down before Slaughter shot him.

Slaughter in his own behalf said, "I told him that wasn't no dime's worth of cheese; he said it was, and he said 'that makes twice you have been calling for cheese and didn't take it,' and he said 'I am going to whale hell out of you' and I walked on towards the stove; I had the guitar string in my hand; and he walked on down behind the counter, and come towards the stove. He said, 'what do you mean by fooling with me about this cheese;' I said 'I ain't fooling with you, Mr. Jenkins' and he said, 'I am going to whale hell out of you,' and he hit me a back-hand lick with his fist in my mouth, across the mouth; I fell back on the floor and he kicked me several times while laying there; and I went around on one side of the stove and he went on the other, meeting on the opposite side of the stove from where the altercation

commenced, when he said 'I am going to kill you, you black S—— o—— B——;' that he then jerked his pistol out and shot twice." He further testified that he shot Jenkins because he thought he was going to kill him, as he said he was going to kill him when he knocked him down.

There is no evidence whatever of any previous difficulty or unfriendliness or bad-feeling between the parties. Slaughter had before this time purchased articles in the store, and the parties were well acquainted. Nor is there any fact or circumstance from which it can be inferred that Slaughter, or the other negroes, or any of them, went into the store for the purpose of creating a disturbance, or that it was anticipated that any difficulty would take place. The fact is that the trouble came up in a moment, and had its origin in the remark that Slaughter made about the cheese. Under this evidence it is earnestly insisted that Slaughter was only guilty of manslaughter, as the shooting was done in sudden heat and passion and without the malice which is a necessary ingredient in the crime of murder. There is some basis for this conclusion, but, as the jury was properly instructed upon the subject of murder and manslaughter, we are not prepared to say that their verdict was so excessive as to justify us in interfering with it on this ground.

Slaughter was arrested on the day of the homicide, and placed in jail, where he remained until the trial. The indictment was returned on the 4th of March, and on the following day it being known to the court that Slaughter was unable to procure counsel to defend him, the court appointed W. T. Fowler, an attorney of the Hopkinsville bar, to represent the accused. On the next day the order appointing Fowler was set aside, and H. W. Linton and A. H. Clark, partners in the practice of law were appointed to defend. When the case came on for trial on March 25, these attorneys filed the following affidavit for a continuance:

"Affiants state they are not ready for trial herein for the reason that they have not had sufficient time since their appointment to get in touch with all the persons who would likely be material witnesses for the defendant. That they are informed and believe that there is great excitement among the residents of the vicinity of Edgoten where the killing with which said defendant

is charged occurred, and that there is great hatred and passion in the minds of such persons at this time. That affiants believe that by reason of said excitement' and hatred existing towards the said defendant, the said defendant being a negro and the person with whose killing he is charged being a white man, it is impossible to obtain the testimony of persons who later on and after such excitement subsides will be material witnesses for the defendant; and affiants believe that they will be able to obtain said testimony for the defendant if this cause is continued. Affiants further state that they are informed and believe that a masked band of men on or about the night of the 29th of February, 1910, in the vicinity of the place where the killing with which this defendant is charged occurred, visited and took from their homes two negroes, and whipped one of them, because as affiants are informed and believe they were attempting to raise money to employ counsel for this defendant, or otherwise aiding him in defending this charge. They further state that all the eye witnesses to the killing with which this defendant is charged are negroes, and are now as affiants are informed and believe in the employ of white men in that section of the country; and affiants after having talked to said witnesses it will be very difficult if not impossible to get at the true state of facts about said killing on account of the state of feeling now existing in that community towards the negro race over the killing of Lee Jenkins, and that there is a strong prejudice existing in said community, as affiants are informed and believe, against the defendant at this time. For which reasons they respectfully pray a continuance of this cause."

An affidavit setting up substantially the above facts was also filed by Slaughter.

It is said in behalf of the Commonwealth that the affidavits did not furnish any grounds for a continuance, as they did not disclose the name of any witness that would give evidence in behalf of the accused, or the nature of the testimony that could be procured if a continuance was granted; and that aside from this, all of the eye witnesses to the homicide were present in court and testified in person either for the Commonwealth or the accused. As we understand the affidavits, a continuance was not asked for the purpose of obtaining the evidence of any particular witness, but rather to afford

counsel appointed by the court reasonable time and opportunity to investigate all the facts and circumstances connected with the case and to secure such evidence as might be obtained to show the good character of the accused for peace, quiet and good behavior, and to have on the trial the advice and assistance of his friends and family. We do not, however, deem it necessary to express an opinion on the sufficiency of this affidavit to entitle the accused to a continuance, although we have thought it of sufficient importance to notice as illustrating the unfavorable conditions that surrounded the accused on his trial, and the difficulties that embarrassed his appointed counsel in their efforts to defend him.

The most serious error relied on for a reversal is that relating to the argument of the Commonwealth's Attorney. It appears from the bill of exceptions that during this argument the Commonwealth's Attorney said:

"This defendant's head should be cut off, hung on the end of a pole, and carried through the streets of this city, as an example to all others. * * * I have always admired Napoleon because he cut off the heads of the Egyptians and stuck their heads on the end of poles and had them carried through the streets. Such punishment is too good for this defendant. It is a dirty shame that the fool Legislature passed a law for this new refined way of killing a man. This defendant ought not to be electrocuted. He ought to be taken to the scene of the murder, left there dangling to the end of a rope, on the same spot where Jenkins was murdered. * * * If Gordon Jones had been put on this stand, we would have brought out a story to make your blood run cold. Had he come here and testified, the story he would have told would have made your hair stand on end, like the spikes on a porcupine's back."

To this argument the accused by his counsel at the time objected, but the court overruled the objection, to which ruling counsel excepted; and further moved the court to exclude the same from the consideration of the jury, which the court refused to do.

We have frequently had occasion to consider the question of improper argument by attorneys for the Commonwealth, but we have never attempted to lay down except in a general way any rule of limitation upon their scope and character. The facts and circumstances surrounding the parties are usually so different that the

argument to be effective must of necessity be varied to conform to what is developed in each particular case, and so it is not practicable to set down with any certainty the line of argument that counsel for the Commonwealth may with propriety pursue. But we may safely say that the Commonwealth's Attorney should refrain from going outside of the record to comment on what this or that person would have testified to if introduced as a witness for the Commonwealth. He has of course the right to comment on all the facts and circumstances proven in the case, and to draw from them every fair and reasonable inference and the right to enforce his argument by pertinent and moderate illustrations of the necessity for a rigid enforcement of the criminal law. But he is clothed with great power and speaks with the authority of the State and juries ought to and do give great weight to his statements as the representative of the people, whose duty it is to use every legitimate effort to vindicate the law and bring to justice persons who violate its mandates. Armed with this power and authority, and speaking as a sworn officer of the Commonwealth, he should only ask that justice be done between the Commonwealth and the accused; and this plea he should make in the deliberate, dispassionate manner becoming an officer holding so responsible a place, and not seek by extravagant and reckless statements to inflame the passion and prejudice of the jury. As said in Keaton v. Commonwealth, 32 Ky. L. R., 1164:

"The Commonwealth's Attorney is a sworn officer of the law. Upon him the primary duty of conducting the prosecution is imposed. He is responsible to the people for his conduct. It is his duty to see that the legal rights of the accused as well as those of the Commonwealth are fully protected. The Commonwealth's Attorney who measures up to the full requirements of his office will always see that the defendant has a fair trial. If he believes the defendant to be guilty he will not hesitate to prosecute him; if he believes him innocent, he will not hesitate to say so. He will not ask the extreme limit of the law even if the defendant be guilty when he believes from the circumstances of the case that a milder sentence will be more just. He is never the instrument of vengeance. He should never attempt to secure a conviction at all hazards. He should find his reward not in the plaudits of the relatives of the deceased who are behind

the prosecution, but in the satisfaction of a duty honestly, fearlessly and impartially performed.''

In our opinion the whole of the argument objected to was improper and especially was the reference to Gordon Jones highly prejudicial to the rights of the accused. During the examination of the accused an entirely unsuccessful effort was made to show that the accused said to Jones that he intended to kill Jenkins, and by the line of questioning indulged in by the attorney for the Commonwealth the impression was attempted to be made that the shooting of Jenkins was a premeditated act, in execution of a purpose formed in the mind of the accused some time before he went to the store. But Gordon Jones was not summoned or offered as a witness for the Commonwwealth or the defense, although it was stated by counsel in argument before the bar of this court that for some days before the trial and during the trial Jones was confined in the county jail of Christian County. But, instead of introducing Jones as a witness, although he was virtually in the courthouse during the trial, the attorney for the Commonwealth made the reference to Jones with the evident purpose of leaving the impression on the mind of the jury that the testimony of Jones could not be procured, and that if it could have been, his evidence would have shown that the killing of Jenkins was a premeditated malicious act. It is manifest that this statement made by the Commonwealth's Attorney had great weight with the jury, and we have no doubt contributed in no small degree to induce them to make the verdict they did.

Upon the whole case, we have reached the conclusion that the accused did not have a fair trial, and the judgment is reversed.