### Deacon v. Commonwealth.

(Decided January 15, 1915.)

### Appeal from Bullitt Circuit Court.

1.  **Evidence—Spontaneous Exclamations—Res Gestae—Time of Utterance.**—Deceased was engaged in a fight at a ball game. Defendant approached and struck him with a baseball bat, fracturing his skull. Deceased was rendered immediately unconscious. He was carried a few feet away, and immediately on regaining consciousness, asked "Who hit me?" Held, that the exclamation was as much a part of the occurrence or transaction as if it had been made the very moment after he was struck, and was therefore properly admitted in evidence as a part of the res gestae.

2. Evidence—Statement of Fact.—On a trial for homicide, the question whether or not the deceased saw the defendant at the time he was struck, called for a statement of fact, and not a mere opinion or conclusion on the part of the witnesses.

3. Evidence—Homicide—Character of Deceased.—On a trial for homicide, where the bad reputation of the deceased for peace and quiet was established by uncontroverted evidence of two witnesses, it was not prejudicial error to refuse evidence tending to establish his bad reputation for peace and quiet eight or ten years before the homicide.

4. Criminal Law—Homicide—Self Defense—Instruction.—On a trial for homicide, an instruction which required the jury to acquit the defendant if they believed from the evidence that the defendant "believed and had reasonable grounds to believe he was then and there in danger of loss of life or of receiving great bodily injury at the hands of said Nell, and that it was necessary, or believed by the defendant in the exercise of a reasonable judgment to be necessary, to strike said Nell, etc.," held not subject to complaint.

5. Trial—Separation of Jury.—Where the sheriff and one member of the panel were seen standing about thirty-five feet from the rest of the jury, engaged in conversation, held that such separation was not prejudicial in the absence of a showing that they were discussing the case, or that any member of the jury spoke to or was addressed by any outsider.

NAT W. HALSTEAD, J. F. COMBS and T. C. CARROLL for appellant.

JAMES GARNETT, Attorney General, and ROBERT T. CALDWELL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

Appellant, Herman Deacon, who was convicted of the murder of Robert Nell, and given a life sentence, seeks a reversal of the judgment on several grounds.

The facts are these: Appellant had been paying attention to Mrs. Cravens, a daughter of Nell. On April 6, 1913, appellant went to Nell's home in company with Mrs. Cravens and a Miss VanMeter. After ordering his daughter into the house, Nell cursed and assaulted appellant and ran him off the premises. At the same time he threatened to kill appellant. Later on he manifested hostility towards appellant both at a public sale and at a ball game. He also, in the presence of others, threatened appellant's life. These threats were communicated to appellant. About two weeks before the homicide appellant, according to the evidence of Mrs. Cravens and a Miss Hagan, said that if Nell fooled with him

he would either kill or knock him in the head. Someone had previously asked what would Mr. Nell do if he knew his daughter came with appellant. Appellant's statement was in response to this remark. Appellant denied having made the statement. The homicide took place on Saturday, June 14, 1913. A ball game was in progress between the Lenore team of Nelson county and the Fancy team of Bullitt county. The game was being played on the latter's grounds, near the county line. Nell, as the representative of Bullitt county, was umpiring the bases, while Bud Roby, of Nelson county, was umpiring the balls and strikes. Appellant was a substitute on the Nelson county team. According to the evidence for appellant, Nell had been drinking considerably, and was not, therefore, in condition to umpire with that precision and impartiality which the circumstances required. It was not long before Nell became involved in numerous disputes and altercations. Finally, Jones, of the Lenore team, made some remark indicating very clearly what he thought of Nell as an umpire. Nell lost his temper and began to curse and abuse Jones. Pretty soon he and Jones began fighting. At this time appellant was several feet away. After Nell and Jones had struck several licks, a man by the name of Clark stepped between them and, catching Nell by the arms, began pushing him backwards. At that time appellant was approaching from the rear. When appellant got near enough he struck Nell with a baseball bat and fractured his skull. The blow was struck over the shoulders of a man by the name of Terry. It was further shown by the evidence for the Commonwealth that no conversation passed between appellant and Nell, nor did Nell make any demonstration towards appellant. When appellant was struck he fell to the ground. He was afterwards moved a few feet away. When he regained consciousness he immediately asked, "Who hit me?" According to the witnesses for the Commonwealth, from three to five minutes had elapsed between the blow and the making of this remark. According to the witnesses for the appellant, the time was from five to ten minutes.

According to the evidence for appellant, he had been sitting on a baseball bat. When the difficulty arose he approached the combatants. After two or three blows had been struck by Jones and Nell Clark shoved Nell back. Appellant was standing to the right of Nell. Nell

was dodging first to one side and then the other, in an effort to pass Clark and get to Jones. When Nell reached appellant he threw his left hand against Clark's breast and shoved him back. He then turned his face towards appellant, and, with a very determined expression on his face, said, "What the hell have you got to do with it?" He then ran his hand into his pocket and appellant struck him. Appellant struck him a left-handed lick. He had no intention of killing appellant, but struck him to keep from getting hurt. Nell's skull was fractured behind his right ear. At the time of the tragedy appellant was 22 years old, and had always borne a good reputation.

It is first insisted that the court erred in admitting in evidence the question, ".Who hit me?" asked by the decedent on his return to consciousness a few minutes after he was struck.. The admission of statements as part of the *res gestae* depends, not so much on the question of time as on the question whether or not there was an opportunity to contrive and misrepresent, and whether or not the nervous excitement produced by the event may still be supposed to predominate, and the reflective powers of the mind be in abeyance. The statements need not be strictly contemporaneous with the exciting cause. They may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and be dissipated. Wigmore on Evidence, Sec. 1750. Hence, it is the rule to admit as parts of the *res gestae* not only such declarations as accompany the transaction, but also such as are made under such circumstances as will raise a reasonable presumption that they are the spontaneous utterances of thoughts created by or springing out of the transaction itself, and so soon thereafter as to exclude the presumption that they were the result of premeditation or design. It has been held in a number of cases that the first exclamations of returning consciousness are spontaneous, and therefore admissible even after a considerable interval. Thus, in the case of Johnson v. State of Ga., 65 Ga., 94, it was held that what the person assaulted said, though half unconsciously, so soon as she was found on the day of the assault, at the moment of the restoration of sensibility, was a part of the *res gestae*, and therefore admissible. In the case of State v. Ripley, 32 Wash., 182, the prosecuting witness made certain statements after the rob-

bery occurred. The evidence showed that he was knocked down and dragged in an unconscious condition from that place to the edge of the sidewalk in front of a saloon. On being aroused from unconsciousness the statements were made. It was held that the statements were admissible, though made in the absence of the accused, and that the weight to be attached to them because of the mental condition of the prosecuting witness was for the jury to determine. In the case of Christopherson v. Chicago, M. & St. P. R. Co., 135 Iowa, 409, 124 Am. St. Rep., 284, 109 N. W., 1077, a foreman was run down by a switch engine as he was going on the track to the tool house. His statement that he was going under orders of the roadmaster, made immediately on his restoration to consciousness, though some time after the accident, was admitted as a part of the *res gestae.* In the case of Hinzeman v. Missouri P. R. Co., 182 Mo., 621, 81 S. W., 1134, a track hand was struck by a train. On regaining consciousness he said, "What hit me?" The statement was admitted as tending to show that he had not seen the train before he was struck. In the case of Sutton v. Southern R. Co., 82 S. C., 345, 64 S. E., 401, a passenger was injured in a rear-end collision. Statements as to his condition made immediately upon his being restored to consciousness were held admissible as a part of the *res gestae.* In the case of Paris & G. N. R. Co. v. Calvin, —— Tex. Civ. App., ——, 103 S. W., 428, affirmed in 101 Tex., 291, 106 S. W., 879, a horse was frightened by a whistle from an engine at a crossing and ran away, colliding with the train. As soon as one of the party regained consciousness she stated that the whistle was not blown for the crossing, but at the crossing, frightening the horse. This statement was held *res gestae,* and admissible. In the case of M., K. & T. R. Co. v. Moore, 24 Tex. Civ. App., 489, 59 S. W., 282, the declaration of an injured brakeman, immediately on regaining consciousness, to the effect that "the hand hold gave way," was held admissible as a part of the *res gestae.* In the case of Ft. Worth & D. C. R. Co. v. Partin, 33 Tex. Civ. App., 173, 76 S. W., 236, a declaration by the injured party, immediately after becoming conscious, though twenty minutes after the accident occurred, was admitted as a part of the *res gestae.* In the case of Ritter v. Griswold (Ala.), 56 So., 860, a witness, who had been assaulted, asked, immediately

upon regaining consciousness, what had happened. The statement was held properly admitted as a part of the *res gestae*. And in the case of Britton v. Washington Water Power Co., 59 Wash., 440, 33 L. R. A. (n. s.), 109, 140 Am. St. Rep., 858, 110 Pac., 20, a statement by a boy claiming to have been kicked from a trolley car while stealing a ride, made eight days after the accident, as soon as he regained consciousness, was held to be a part of the *res gestae*. In discussing the question the court said:

"There had been no opportunity for reflection or deliberation. They were as much a part of the occurrence as if they had been made when the boy was raised from the street, immediately after falling. So far as he was concerned, there was no conscious intervening time between the injury and the declaration."

In the case of Bionto v. Illinois C. R. Co., 125 La., 147, 27 L. R. A. (n. s.), 1030, 51 So., 98, the statements of a boy killed by a train, made after recovering consciousness, were held inadmissible. There, however, the boy was entirely conscious when found, and the circumstances showed that he had been conscious some time. That being true, there was an opportunity for reflection; and the case does not conflict with the cases above cited.

In the case under consideration, the deceased was struck and immediately rendered unconscious. He was carried just a few feet away, and, immediately on regaining consciousness, asked, "Who hit me?" The exciting influence had not lost its sway. There was no opportunity for him to contrive and misrepresent. The exclamation was as much a part of the occurrence or transaction as if it had been made the very moment after he was struck. It was, therefore, properly admitted as a part of the *res gestae*.

The Commonwealth introduced several witnesses to rebut the statement of the accused that the decedent turned his face towards him, and, with a very determined expression on his face, said, "What the hell have you got to do with it?" When these witnesses were examined in chief the position of the parties was not clearly brought before the jury. When the accused stated that the decedent turned his face toward him and made a hostile demonstration, accompanied by the remark above quoted, it was certainly within the sound discretion of the trial court to permit these witnesses,

though they had been examined in chief, to rebut the statement thus made. The chief complaint of their testimony in rebuttal grows out of the contention that these witnesses did not testify to facts, but merely expressed an opinion. Witness Clark was asked the question in the following form: "Mr. Clark, at the time of this trouble, just before Deacon struck Bob Nell, did Bob Nell turn and face Jack Deacon and say to him, 'What the hell have you got to do with this?' and throw his hands behind him?" The question was asked of other witnesses in the following form: "Was he (Nell) looking at Deacon at all, or did he see him before he struck him with that bat?" In some instances the question was asked in the following form: "Did Bob Nell see Jack Deacon at all when he hit him?" It is in the latter form that the question is particularly objected to, on the ground that the question whether or not Nell saw the accused was not a fact about which the witnesses could testify, but called for a mere expression of opinion. It seems to us that this distinction is more metaphysical than substantial. While metaphysicians may dispute as to the actual existence of external matter, and as to whether or not its existence may be directly apprehended by the eye or is founded on a process of generalization based on particular experiences, we take it that in law external matter actually exists, and may be seen by the eye. Here the accused was within a very short distance of the deceased. The deceased was not blind. If the deceased looked at the accused he necessarily saw him. That the accused may have been within the range of his vision, and that the deceased might have seen him by turning his eyes at an angle, was not the question in dispute. The accused said that the deceased turned his face towards him. The purpose of the evidence objected to was to show the contrary. Under these circumstances the question, "Did Bob Nell see Jack Deacon at all when he hit him?" called for a statement of fact and not a mere opinion or conclusion on the part of the witnesses.

It is next insisted that the trial court erred in excluding certain evidence with reference to the bad reputation of the deceased for peace and quiet. It appears that defendant offered two witnesses who fully qualified and stated that the reputation of the deceased as a turbulent, violent and dangerous man, especially when

drinking, was bad. Several other witnesses testified that about eight or ten years prior to the homicide the deceased lived in their county, and that his reputation there for peace and quiet was bad. This evidence was excluded. They did not know what his reputation was since that time. It is argued that as defendant proved the bad reputation of the deceased covering a period of about 25 years, and brought it up to the time of the homicide, it was error to exclude the evidence of the other witnesses who had known deceased's bad reputation several years before the homicide. The trial judge excluded that evidence on the ground that it was too remote. Without passing on the question of its admissibility, it is sufficient to say that we are unable to perceive how its rejection was prejudicial under the facts of this case. The bad reputation of the deceased for peace and quiet was shown by two witnesses. The Commonwealth did not undertake to show the contrary. His bad reputation being thus established by evidence that was in no way rebutted, it was not prejudicial error to refuse evidence tending to establish his bad reputation for peace and quiet eight or ten years before the homicide.

Still another ground urged for reversal is error in the instruction on self-defense. That instruction is as follows:

"If you believe from the evidence that at the time he struck R. P. Nell with a baseball bat (if he did so), the defendant believed, and had reasonable grounds to believe, he was then and there in danger of loss of life or of receiving great bodily injury at the hands of said Nell, and that it was necessary, or believed by the defendant in the exercise of a reasonable judgment to be necessary, to strike said Nell with a baseball bat in order to avert that danger, real or to the defendant apparent, then you should find defendant not guilty, on the ground of self-defense and apparent necessity; on the other hand, if you believe from the evidence, to the exclusion of a reasonable doubt, that the defendant, when he did not believe, or did not have reasonable grounds to believe, that his life or person were in danger at the hands of said Nell, did first wilfully and voluntarily assault said Nell with a basebal bat, and in so doing make the harm or danger to himsef, if any there was, necessary or apparently necessary or excusable on the part of Nell in his own necessary self-defense, you should not in that

event excuse the defendant on the ground of self-defense.''

In a case like this there are two questions on which the accused is entitled to exercise his own judgment: (1) The danger; (2) the necessity for killing the deceased in order to avert such danger. It frequently happens that one or the other of these questions is left solely to the determination of the jury, and instructions which so provide are held erroneous. Thus, in the case of Sizemore v. Commonwealth, 158 Ky., 492, the self-defense instruction required the jury to believe ''that the defendant was in danger of death or the infliction of some great bodily harm at the hands of Grant North,'' instead of making the question depend on whether or not defendant believed and had reasonable grounds to believe that he was then and there in danger of death or the infliction of some great bodily harm, etc., and the instruction was therefore condemned. In the case of Austin v. Commonwealth, 28 Ky. L. R., 1087, the instruction was proper in requiring the jury to believe from the evidence that ''the defendant believed, and had reasonable grounds to believe, that he was in impending danger of death or great bodily harm at the hands of his assailant,'' but was held erroneous because it further provided ''and that he had no means of avoiding such danger or apparent danger,'' thus leaving to the jury the determination of the latter question instead of making it depend on the belief of the accused. The instruction in this case is complained of because of the use of the clause ''and that it was necessary,'' as applied to averting the danger. If this clause alone had been used the instruction would have been subject to the objection pointed out in the case of Austin v. Commonwealth, *supra.* However, the instruction does not stop with the words complained of. It goes further and adds the following words: ''or believed by the defendant in the exercise of a reasonable judgment to be necessary to strike said Nell,'' etc. As the necessity for striking the deceased in order to avert the danger was not made an actual necessity to be determined by the jury alone, but the defendant was given the right of self-defense, not only under that state of case, but also in the event of his belief, in the exercise of a reasonable judgment, that it was necessary to strike the deceased in order to avert the danger, real or to the defendant apparent, it follows that the instruction is not subject to complaint.

Lastly, it is insisted that defendant was prejudiced by the separation of the jury. Several affiants say they saw the sheriff who was in charge of the jury and one member of the panel standing about thirty-five feet away from the rest of the jury, engaged in conversation. Not only is there no claim that the sheriff and the juryman were improperly discussing the case, but the sheriff's affidavit to the effect that he did not in any manner discuss the case with the juryman in question, or any other member of the panel, stands uncontroverted. Nor does it appear that on the occasion in question any member of the jury spoke to or was addressed by any outsider. Under these circumstances, the alleged separation of the jury cannot be regarded as prejudicial to the substantial rights of the defendant.

Judgment affirmed.