## Ratcliffe v. Commonwealth.

(Decided October 29, 1929.)

338

THURMAN B. DIXON for appellant.

J. W. CAMMACK, Attorney General, and JAMES M. GILBERT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE WILLIS—Affirming.

Ballard E. Ratcliffe was convicted of the crime of willful murder and condemned to die in the electric chair. He has prosecuted an appeal from the judgment of conviction, complaining that the trial court committed error

prejudicial to his substantial rights in certain rulings re-
specting the admission and exclusion of evidence, and in
refusing to restrict the argument of the commonwealth's
attorney as requested by him.  In order to appreciate
the questions presented and to understand the decision
of the court disposing of them, it is essential to have an
understanding of the facts that confronted the trial
court.

One Sunday morning in May, 1928, William A. Muse
was found in a cemetery in Louisville staggering and
bleeding from several serious wounds in the head.  His
rifled pocket was hanging inside out, affording mute tes-
timony to the motive that actuated the assailant.  Muse
was taken to a hospital, where it was learned that his
skull had been fractured in three places, once just above
the ear at the thinnest part of the skull, once on top of
the head, and once between the other two fractures.  He
lingered and languished in the hospital a few days and
died from the wounds. It was ascertained that the wife of
Muse, who had died a few years previously, was buried
in the cemetery where Muse was hurt.  It had been his
custom every Sunday morning from the time of her death
to visit and decorate her grave.  He was sufficiently con-
scious when on the way to the hospital to request the
men who found him to go back to the cemetery and com-
plete his unfinished work of placing the flowers appro-
priately on the grave.  The request was complied with,
and by the side of the wife's grave the men found some
flowers and the grass pressed down corresponding to the
form of a man.  A pool of blood marked the spot where
the man's head had rested.  Glancing about, a new ham-
mer was discovered behind a tombstone a few feet away.
It was an instrumentality capable of producing the
wounds found upon the head of Muse, and blood stains
were found on the handle and on the hammer.  A son
of the sexton at the cemetery, a few minutes before, had
seen a man running from the cemetery.  Later in the day
he identified appellant as the man he saw.  Henry Wal-
ters was driving an automobile to the cemetery and, as
he approached, observed a man running toward the gate.
As no street car was near, no reason for haste was ap-
parent, and the circumstance impressed itself on the
mind of Walters, inducing him to pay particular atten-
tion to the form and features of the man.  As Walters
entered the gate to the cemetery, the man slowed down
to a walk and passed within four feet, affording the wit-

ness a good view of his face. Walters identified the appellant as the man. Appellant was also identified by another man who saw him running down the street after he had passed from the cemetery gate. The motorman and a passenger on a street car each identified the appellant as the man seen on the street car with Muse on the way to the cemetery, only a short time before the injured man was found. After Muse had been operated upon by the physician and had regained consciousness, the appellant was taken to his room at the hospital. The injured man arose in the bed, pointed his finger at appellant, and exclaimed: "There is the bastard that done it!" One witness stated that he used the word "buzzard," but the other witnesses, including the appellant himself, gave the language as quoted. Muse was known to carry about upon his person a large roll of paper money. He had an eccentric habit of displaying the money rather promiscuously, and frequently made change for the landlady where he boarded. The money was in both small and large denominations. The exact amount of it is not shown, but the testimony indicates that it constituted a considerable sum. Muse and Ratcliffe took meals at the same boarding house. On the Saturday evening before Muse was hurt he displayed his roll of money in the presence of appellant and several others. The party dispersed leaving appellant and Muse engaged in conversation, which was continued for a little while, but which was not overheard. There was testimony tending to show that Ratcliffe had little or no money before that time. He had borrowed 50 cents from a fellow roomer on Friday and tried to borrow a trifling sum from another friend. His employer lent him $5 on Saturday. He owed back rent for his room at the Y. M. C. A. amounting to $35, and on Saturday paid only $3.25, which was slightly less than room rent for a week. When urged to pay more on his account, he said he could not spare any more than he paid. He played penny-ante poker with some friends at the Y. M. C. A. until after midnight on Saturday night. It is not shown that he displayed any money at that time. At 6:15 Sunday morning he was seen in the bathroom at the Y. M. C. A. engaged in shaving. So far as shown by the record, no one saw him leave the Y. M. C. A. that morning. He says he went back to bed and did not leave until after 9:30 a. m. But no one there saw him until some time Sunday afternoon, when he came in and was arrested. When he was ar-

rested he had in his pocket paper money aggregating $626. The denominations ranged from dollar bills to $50 bills. When called upon to explain the possession of so much money, he said he had won it on the races the preceding Wednesday and Thursday. He could not then name the horses or the races upon which he had been so lucky. In explanation of his refusal to pay his room rent, when he had so much money, he said he was afraid the rent would be raised. And in answer to questions as to his reason for borrowing small sums when he was so affluent, he said he did it to establish his credit for use in case of real need. He explained his whereabouts during the fatal Sunday, but strange to say he saw no one he knew during all that time. He also said that no one he knew saw him at the races. There were two trials of the case. On the first trial the jury failed to agree, and on the second trial Ratcliffe was convicted and sentenced to death. His right to a reversal is rested upon three grounds which will be disposed of as the opinion proceeds.

It is first insisted that the court erred in admitting incompetent testimony on behalf of the commonwealth. The objection is addressed to the cross-examination of the defendant upon the trial in regard to alleged confidential communications which he had made to his attorney. One of the police officers had testified to an incident which occurred at Ratcliffe's examining trial in the police court. Henry Walters was testifying in the police court to the effect that he had seen the appellant run out of the cemetery. When the testimony was introduced, one of the attorneys then representing the appellant asked him if he had seen Walters as he ran out of the cemetery, and he said he had not. The testimony was clearly competent and was admitted without objection. The incident occurred in the presence of many people and was not intended as a secret communication. It was not proven by the attorney to whom it was addressed, but by one who heard it under circumstances bearing no resemblance to a privileged occasion. When defendant was upon the witness stand, his own counsel did not ask him about the statement; but upon cross-examination by the commonwealth's attorney his attention was drawn to the incident, and he was asked whether he made answer to the question of his attorney in substance as testified to by the commonwealth's witness. An objection was interposed upon the express ground that a confidential

communication was involved, and the court sustained the objection. A colloquy ensued, during which the question was raised whether the appellant was willing to waive the objection and be examined upon the subject. The court advised the appellant that he was not obliged to answer it if he did not want to, as it was privileged and neither the attorney nor the client could be forced to testify respecting it. His counsel then withdrew the objection and waived any right to exclude it as a confidential communication and consented for the defendant to answer the questions. One of the attorneys for the commonwealth nevertheless insisted that the defendant should personally make the waiver, and the court again admonished the defendant that he did not have to answer the question. But appellant answered anyway and denied that his attorney had asked him any such question or that he had answered it. In the first place, it is clear that the testimony was competent. The Civil Code of Practice, sec. 606, provides by subsection 4 that "no attorney shall testify concerning a communication made to him, in his professional character, by his client, or his advice thereon, without the client's consent." It forbids the proof of such communications by the attorney without the client's consent. It does not prevent the proof of such communication by a witness otherwise competent. In Carter v. West, 93 Ky. 211, 19 S. W. 592, 14 Ky. Law Rep. 191, cited by the appellant, it was held that an attorney is not permitted to testify as to communications made to him in his professional character by his client unless the client consents, and neither the cessation of the employment nor the death of the client will render such testimony competent. In Standard Fire Ins. Co. v. Smithhart, 183 Ky. 679, 211 S. W. 441, 5 A. L. R. 972, also cited, it was held that, although the relationship of attorney and client has ceased, the attorney is not permitted, without the consent of his client, to testify as to the communication made to him in his professional capacity. The exclusion is limited to the attorney alone, who may not be called as a witness to prove lawful communications confidentially made by the client. Obviously a declaration publicly made by a party, although addressed to his counsel, may be proven, if relevant and competent, by any one who heard it.

In addition to what has been said, the objection to the cross-examination was expressly waived both by the attorney and client, and he chose to answer the question, although the court had distinctly ruled in his favor.

Moreover, it gave the appellant the benefit of a denial of the testimony of the officer and cured the omission of appellant to make the denial in his direct testimony. The result is, in any view that might be taken of the incident, that no error was committed. The objection to it, after being sustained, was withdrawn; the matter was a proper subject of inquiry; and it was beneficial to the defendant in furnishing an opportunity for the contradiction of testimony which, up to that time, stood unchallenged.

The evidence excluded by the court, and of which complaint is made, consisted of the testimony of the two ladies who kept a boarding house where both Ratcliffe and Muse took their meals. When they learned that Muse was hurt and at the hospital, they went to see him, and while there each asked him to describe his assailant. To one of the ladies he said it was a tall slender man with black hair, wearing a light gray suit and a light hat. The other lady testified that to the best of her knowledge he said the man wore a light gray suit and a light hat, and at first mentioned glasses, but the second time he omitted to mention the glasses. These ladies visited the hospital on the morning Muse was injured and fixed the time as after 9 o'clock. One of them said it was between 10:30 and 11 o'clock. Muse had been injured about 8 o'clock. It is earnestly insisted that the exclusion of this testimony was erroneous and prejudicial. It is first said that it was a part of the res gestae and admissible as such. Postell v. Com., 174 Ky. 272, 192 S. W. 39; Deacon v. Com., 162 Ky. 189, 172 S. W. 121. The court had refused to permit the commonwealth to prove statements made by Muse at the cemetery, after he had been taken to the office, and before he was taken to the hospital. It is the rule to admit as part of the res gestae such declarations as accompany the transaction, and also declarations made under such circumstances as will raise a reasonable presumption that they are the spontaneous utterance of thoughts created by or springing out of the transaction itself and made so soon thereafter as to exclude the presumption that they were the result of premeditation or design. Deacon v. Commonwealth, 162 Ky. 191, 172 S. W. 121; Rogers v. Commonwealth, 161 Ky. 754, 171 S. W. 464. As the statements in question were made an hour or more after the injury had been inflicted and after the injured man had been removed to the hospital and afforded ample time, after regaining consciousness, to reflect, it was not within the rule admitting declarations as part of the res gestae.

It is further contended that the evidence was admissible upon the ground that it contradicted the identification of appellant by Muse. The identification was a fact that transpired in the presence of the appellant, and it did not depend upon a description of his person or his apparel. Such an identification would not be contradicted by a description of his clothing, even if it differed from that he was wearing. No dying declarations were admitted, and the evidence was not admissible in contradiction of anything of that kind. Where dying declarations are competent and admitted in evidence, any contradictory statements of the declarant may be admitted to impeach the verity of the dying declaration (Blackerby v. Com., 200 Ky. 832, 255 S. W. 824; Colson v. Com., 200 Ky. 402, 255 S. W. 60); but the rule has no application when no dying declaration is proven. We are unable to find any principle of law upon which the testimony could be regarded as competent, and it follows that the trial court ruled rightly in excluding it.

Finally, it is insisted that the commonwealth's attorney misbehaved in his concluding argument to the jury. His speech to the jury is set forth in full in the transcript. Some twenty-five or more objections were interposed, as the argument proceeded, all but two of which were overruled. The first objection was to a statement as follows: "It seems that when a man is put on trial for life, when he is surrounded by his friends, with eloquent and accomplished counsel to plead his cause, sympathy will be engendered in the minds and hearts of the jury while his victim has gone to a bar removed from this court, and in this case is under the sod six feet below the ground beside the beloved wife to whose memory he paid a tribute that Sunday morning."

The next objection was to a statement regarding the character of the duty imposed upon jurors in such a case, and was in answer to an argument of counsel for defendant in which he had said: "Go write a death verdict and then see if you will go home and enjoy it." The commonwealth's attorney later remarked that when robbers go out to get a victim, most of them of the unintelligent classes will hit a man and stun him and rob him of his money, but here the assailant knew his victim had to be put out of the way to prevent identification. He also stated that three times the victim had been hit in the head with gigantic strength. Further along there was a reference to the blood and gray hairs found on the hammer, which had been introduced in evidence. The

commonwealth's attorney referred to the effort of the Y. M. C. A. to collect its back rent and remarked that appellant borrowed $5 to keep from being thrown out on the street. The commonwealth's attorney admitted that there was no evidence about appellant being thrown out on the street, but he thought it reasonable to infer that when a man owed $35 and paid less than one week's rent he might reasonably expect to be evicted. Another reference was to the conversation between Ratcliffe and Muse on Saturday evening at the boarding house after the other men had left. The argument was to the effect that an arrangement had been made on that occasion for Ratcliffe to accompany Mr. Muse to the cemetery. The commonwealth's attorney did not say that any one so testified, but, in the light of subsequent events, he drew that inference from the fact of a conversation between the two men. He also made a point with reference to the new hammer which was found to the effect that it had been purchased by Ratcliffe Saturday evening during his brief absence from the poker game. He referred to the fact that the stores were open at that time, which was developed by one of the witnesses. Without reciting further the objections to the argument, all of which were of the character indicated by the instances given, it is sufficient to say that they were wholly without merit. The argument of the commonwealth's attorney was based only upon the facts proven and deductions reasonably to be drawn from those facts. It was a strong and earnest argument, but a fair one.

It has been held that the attorney for the commonwealth may argue the facts adduced and all inferences reasonably deducible therefrom. So long as the attorney adheres to the record for his facts and to reason for his deductions, he is within his rights, and not without the pale of the law. Moore v. Commonwealth, 223 Ky. 133, 3 S. W. (2d) 190; Johnson v. Commonwealth, 225 Ky. 416, 9 S. W. (2d) 53; Lawler v. Commonwealth, 182 Ky. 185, 206 S. W. 306; Slaughter v. Commonwealth, 149 Ky. 5, 147 S. W. 751. The circumstances attending the commission of the crime involved in this trial made it peculiarly atrocious. The victim, pursuant to his custom, was placing flowers upon his wife's final resting place. While bending over the grave of his loved one, and paying tribute to her memory, he was cruelly stricken down. The moment was a solemn one sufficient to touch and give pause to the most hardened. Yet at

such a time and place some one was fiendish enough, through motives of gain, to lay murderous hands upon the helpless man and crush out his life. The crime was one of premeditation, and previous preparation to commit it was manifest. It was not to be expected that an argument on such evidence would omit reference to the dramatic quality inherent in the proven facts. It has never been held that it was improper in an argument to deal with the facts and circumstances developed by the evidence. On the contrary, that is the very limit by which an argument is to be tested. If the facts afforded a foundation for a telling and effective presentation of the argument, the defendant has no just ground for complaint.

It is apparent from the record that appellant had a fair trial. The crime was a horrible one without an extenuating circumstance. Appellant denies that he committed it, but the proof points to his guilt. It does not point even the finger of suspicion at any other person as the author of the crime. O'Brien v. Commonwealth, 89 Ky. 354, 12 S. W. 471, 11 Ky. Law Rep. 534. The appellant was defended by an able, eloquent, and experienced attorney, who carefully preserved every right of the accused vouchsafed to him by the law of the land. The trial court, in the conduct of his trial, accorded appellant every proper consideration. The tribunal upon which rested the responsibility of determining his guilt or innocence has found beyond a reasonable doubt that he was guilty and fixed, within the limits of the law, his punishment to fit the crime. It becomes our solemn duty to confirm the judgment pronounced by the circuit court pursuant to the verdict of the jury.

Whole court sitting.

The judgment is affirmed.