## Pulliam v. Commonwealth.

Feb. 22, 1944.

Marion Rider and Louis Cox for appellant.

Hubert Meredith, Attorney General, and Blanche Mackey, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

On or about January 4, 1943, the grand jury of Franklin county returned an indictment against appellant, charging him with the murder of Edith Long by hitting, striking, kicking and wounding her, in and upon the head, body, arms, limbs and person, with his fists, feet, or in some manner or means, an exact description is to the grand jury unknown, from which hitting, kick-

ing, striking and wounding said Edith Long did then and there die. Counsel for defendant moved the court to require the Commonwealth to furnish and file in the prosecution a bill of particulars showing the date and day, and the place in Franklin county, Kentucky, it is asserted by the Commonwealth that the defendant committed the acts charged in the indictment from which the deceased died; and also to elect and state whether it asserts and relies upon the death of the deceased as having been produced by the hitting, striking, kicking and wounding of her in the manner set out in the indictment, or whether it relies upon the death of decedent having been produced in some manner or means other than with his fists or feet. The court sustained the motion and the Commonwealth filed a bill of particulars in which it asserted that the day or date on and during which defendant committed the acts of beating, etc., as charged in the indictment, were the days during the two week's period immediately preceding October 6, 1942, and the place at which defendant committed the acts set out in the indictment during the period referred to in the preceding paragraph, and upon which plaintiff relies for a conviction, occurred at the residence occupied by Mae Adams situated on Madison Street, Frankfort, Franklin county, Kentucky, and premises adjacent thereto, and at a house or residence on Washington Street, Frankfort, and premises adjacent thereto. Upon a trial of the action the jury returned a verdict finding appellant guilty of manslaughter and fixed his punishment at 21 years in the penitentiary, and from the judgment entered upon that verdict Pulliam has appealed.

Grounds for reversal relied upon are (1) the evidence does not warrant the conviction and the court erred in overruling appellant's motion for a directed verdict; (2) misconduct of counsel for the Commonwealth; and (3) incompetent evidence. We will discuss the points in the order named.

The appellant and deceased, Edith Long, were not married but it is shown by the undisputed evidence and admitted by appellant that he and the deceased had lived together at various intervals for the past several years and continuously from August, 1942, to October 7 or 8, 1942, a few days previous to decedent's death on October 18, 1942.

Mae Adams testified that appellant and the deceased lived in an apartment or rooms in her home on Madison Street, Frankfort, during the latter part of the summer or early fall, 1942, until about October 3 when they moved to Washington Street. According to the evidence of Mae Adams and Florence Rice, beginning on September 25, 1942, until October the second or third, appellant and deceased had fights practically every day and on one day two or three. The witness saw some of the fights and heard others while they were in adjoining rooms, and they heard the deceased beg appellant to quit beating her, saying: "Please don't hit me no more—I can't stand it." They saw the deceased after these fights and said her nose was bleeding, her eyes were blacked, her face skinned, and perhaps other body and flesh bruises. Mae Adams testified that on one occasion she saw appellant hit the deceased in the breast and knock her over on the floor, and on other occasions he kicked her in the side. One of the witnesses testified that during one of the fights she heard deceased "holler about her eyes" and said "he was trying to punch her eyes out." At another time appellant followed the deceased to a restaurant and they had a fight on the street and appellant kicked her in the side. On that occasion a taxi driver referred to as "Beelo," intervened for the protection of the deceased, and on another occasion appellant hit her with a washboard and they heard her begging him not to hit her any more. On October 3 appellant and the deceased moved to Washington Street into a room or apartment in a house belonging to Pythian True. Florence Rice testified that on Wednesday, October 7, she went to the apartment where appellant and deceased lived on Washington Street and found deceased in the bed in a helpless condition; that she could not use her right hand, and that while she was there the deceased's brother came and took her to the home of her mother, Mrs. Cora Hoover, a few miles out in Franklin county. In the meantime, on or about October 6 appellant's mother had a warrant issued for him for drunkenness and he was confined to the workhouse and did not see the deceased any more.

Walter Linton, testifying for the plaintiff, stated that in the early part of October, 1942, he lived in the lower part of the house on Washington Street, and on Saturday night October 3 appellant and Edith moved into a room upstairs over his room. He said that on

that night he heard a noise and heard Edith say three times " 'James, don't hit me no more,' and then I heard her hit the floor three times and then I heard the sink turned on." Later, on redirect-examination, he said that on the next day he saw appellant at Alec Gordon's place and appellant said to him: "I heard you said we was raising hell up there."

Mrs. Cora Hoover, mother of deceased, testified as a witness for the Commonwealth and was asked if on or about October 7, 1942, she learned that something had happened to her daughter, and she answered: "Well, yes; I learned on October 7. It was about eleven or half-past, something like that or twelve." She said that early the next morning she went to Frankfort and found her daughter on Washington Street, the place referred to by other witnesses, and she was lying in bed and she got her up and dressed her and took her to her home where she kept her six or seven days before she was taken to the hospital on October 15, three days before she died. She was asked to describe her daughter's condition when she found her on Washington Street and she said: "She had a black eye and her throat was all black, looked like she had been choked and had some teeth knocked out and had a black spot on her left side and her right leg was beaten and black down to her foot and her right arm seemed to be pulled out of place." She said that she had a black spot on her back "just like from somebody's fist in her back" and could not move her right arm and she fed her. Mary Ennis testified that on the first of the week, Monday or Tuesday, October 4 or 5, she saw appellant at Alec Gordon's place and that he had a swollen hand and she asked him what was the matter with his hand and he said he had a fight with "Beelo." Beelo was the taxicab driver who intervened in the fight between appellant and Edith, referred to in the evidence of Florence Rice. We do not see where this has any bearing on the case except it may tend to corroborate the testimony of Florence Rice.

Dr. J. E. Washington testified that on or about October 6, 1942, the appellant came to his office and asked him to go and see Edith Long and when he went to their room on Washington Street he found Edith lying on the bed. He asked her what was hurting her and what was her trouble, and she said: "I had a fall." He examined her and her temperature at that time was 101 and she was just speaking above a whisper; her left

eye was bruised and in examining her chest he found that she had a lot of cold and there was a bruise over the left breast the size of a half-dollar or a dollar. He then examined her abdomen and there was marked pain and when he touched it it was sore; he examined her right leg and she said: "I can feel you touch it, but I can't move it." He said he raised her leg but if a little too high she said it would be very painful to her. He advised her that she should go to the hospital. He said a day or two later appellant came back to his office and asked him to go see Edith again, and on the second visit he found that she could move her left arm and leg but could not move her right leg or arm. He again advised her to go to the hospital. He was asked if appellant made any statement as to how Edith was hurt and he said he did not.

Dr. Joseph Barr, a licensed practicing physician of Frankfort, testified that he saw Edith Long on October 15, the day she was brought to the hospital. He said she was in an unconscious condition and she had bruises all over her face and body and was very delirious and "extremely twitchy all over," and died three days later, October 18. He said he could see that she had suffered trauma of some kind; that she had bruises all over her limbs, face, chest, arms and legs; that her abdomen was the only place that she did not have bruises. He said on the day she died a post mortem autopsy was made in his presence by Dr. Miller. He was asked to state what the autopsy disclosed with reference to any wounds on her body and as to what caused her death, and he said that it was just what a physical finding showed before the autopsy was made, bruises on her body and a fracture over the right temple and a skull fracture about two and one-half inches long and that she died from the fracture of the skull and hemorrhage of the brain. On cross-examination he was asked if he found any blood in the membrane that covers the brain and he said he found close to a pint of blood between there and the brain; showed a great deal of pressure and the hemorrhage was considerably more than he ever saw before. He was asked if he could give any information as to how long he thought the blood clot had been there and he said most of the hemorrhage probably occurred the day that she was brought to the hospital in an unconscious condition; that prior to that, from the history he got of it, she had been doing reasonably well

as he was informed. In another question counsel referred to the injury to her head as a "slight fracture" and the doctor said: "That wasn't a slight fracture; about two and one-half inches long," indicating that it was an unusual or large fracture.

• Louis LeCompte, Coroner of Franklin county and funeral director and embalmer, testified that he had been engaged in that business for thirty-seven years. He said he had made a study of the parts of the human body and their functions, the wounds that might be made on a body and what causes them, bullet wounds and any kind of an abrasion or wound on the body. He said he prepared the body of Edith Long for burial and was present when the autopsy was made on the body by Dr. Miller in the presence of Dr. Barr. He said he made a careful examination of decedent's body before the post mortem examination or autopsy was started and found numerous old bruises all over the body; no open wounds but there were traces of two wounds that had healed and were of a greenish-yellow tinge, showing they had been made some time and had been absorbed by nature to a greater degree than when he examined them. He said some of the worse wounds were on the left limb about two inches below the knee-cap, and on the right limb, and another large bruise right over the left breast above the nipple and a bruise on the left shoulder and between the base of her neck on top of the shoulder. He further described her condition about the same as described by Dr. Barr. After making the external examination he examined the body internally. He described the injuries found and said that near the large bruise on the left breast there was a clot of blood and pretty extensive from the tissue of the skin to the left limbs; that between the breasts in the center of the breasts there was another hemorrhage that did not show from the external examination and was as large as a silver dollar and a very heavy hemorrhage had been there and was still there. He said that the lung cavity was enlarged and there were signs of pneumonia in the left lung and the heart showed recent hemorrhages or clots in the heart itself.

The appellant, testifying in his own behalf, admitted that he and Edith Long lived at Madison Street in the latter part of September and moved to Washington Street in the early part of October at about the time testified to by the witnesses for the Commonwealth.

He denied that he and Edith had any fight or fights while they lived at Madison Street, testified to by Mrs. Adams and Florence Rice, and denied that Florence Rice had been at his house or apartment since September 21. He categorically denied that he and Edith had any fights at any time or place testified to by the witnesses, or that they ever had a fight at all, but admitted that they had quarreled. He admitted that he called Dr. Washington to go to his Washington Street room to see Edith and that she told Dr. Washington that she had a fall. He said that on or about October 6 he went to his mother's home and told her that he was worried about Edith and that he was drinking and his mother had a warrant issued for him and had him locked up on a charge of drunkenness and that he never saw Edith any more. He said that after they moved to Washington Street he had worked all day and was drinking some too, and when he went to bed he never got up; when he woke up in the night Edith was not in the bed and he got up and found her lying between the stove and the sink in the kitchen and he got her up and put her to bed, but denied that they had any fight or argument. He said that on Sunday morning following the night referred to above, Edith did not get out of bed and said she did not feel like getting up and he asked her if anything was hurting her and she said "no;" on the next day he called Dr. Washington to go and see her. He denied that he stated to Walter Linton that he heard that Linton had said "they had been raising hell up there the night before," but he admitted that he saw Linton and talked to him about some sweaters. He said that the statement he made to Linton about his swollen hand as a result of a fight with Beelo happened sometime in August. In reference to the statement that Edith made to Dr. Washington about having a fall he said he told Dr. Washington that she had fallen down some steps on Madison Street. It may be noted, however, that Dr. Washington testified that when she said she had a fall appellant said nothing or made any answer. He further testified that Edith did fall down some steps on Madison Street but he did not describe the nature of the steps, or how far she fell, or the nature of the injury received, or whether or not her head struck anything which might have produced the fracture of the skull. On this point his evidence is very indefinite and unsatisfactory. He admitted on cross-examination that

he and Edith had lived together part of the time since 1937 but he did not know how long he had lived with her at different times, but they had lived together continuously since August, 1942. He was asked if he and Edith got along all right during the time they lived together and he said not all the time; that they would have some arguments but they had no fights, and further said: "I never laid my hand on her." He admitted that Edith had bruises on her on Sunday morning after they moved to Washington Street but said they had been there since she fell down the steps on Madison Street on Tuesday before that Saturday night.

Maggie Pulliam, mother of appellant, testified that she was at the apartment of appellant and Edith on Wednesday, September 30, before they moved to Washington Street on Saturday, October 3. She said that Edith was ironing, or she saw some ironed clothes on the table; that she stayed there about an hour; that she noticed a skinned place on her knee about the size of a quarter and she asked her what was the matter with her knee and she said she was drunk the other night and fell and skinned her knee; that there was also a skinned place on her face and she told her that she was drunk and had fallen on the floor. Pythian True, the owner of the house on Washington Street where appellant and Edith lived or moved to on October 3, testified that they moved there in a Ford truck and·that he saw Edith and that she walked there with him from Madison Street. He said that after they moved into his house he went back on the next day, Sunday afternoon, and Edith was in the bed and he went back again on Tuesday and she was still in the bed. He was asked where appellant was and he said he did not know, indicating that he did not see him on either of those occasions.

The argument for appellant is that there is no substantial evidence of a probative nature tending to show that appellant inflicted upon the body of the deceased such wounds as would have caused her death, and particularly the fractured skull which, according to the evidence of the doctors and the undertaker, was the proximate cause of her death. However, in view of satisfactory testimony tending to show a series of violent assaults upon deceased by appellant between the dates of September 25, 1942, and October 6 or 7, and the unsatisfactory explanation of appellant with respect to the cause of the fractured skull of the deceased,

other than the mere statement that she fell down the steps on Madison Street without any further description or nature of that fall or the injuries produced, or the likelihood of her having sustained a fractured skull as a result of the fall, we think the proven facts considered in connection with the well connected chain of circumstances was sufficient to take the case to the jury.

The next complaint is concerning the alleged misconduct of the county attorney in his argument to the jury. In referring to the evidence of Mrs. Cora Hoover, mother of the deceased, the county attorney said that she received word "from her own son in that, James has beat Edith up again," to which counsel for the defendant objected and the court said: "Gentlemen, if you did not hear such testimony, don't pay any attention to such statement; but if you did, you may regard it. I leave it entirely in your hands." It is shown in the bill of evidence that when Mrs. Hoover was asked if she learned if anything had happened to her daughter she said: "That night my son come to me and told me—." At this point counsel for defendant objected and the court admonished the witness just to answer yes or no if she learned anything about her daughter, but she did not state what her son told her, as stated by the county attorney. The conduct of the county attorney in misquoting the evidence, whether intentionally or inadvertently, was improper, but since there was an abundance of other evidence of numerous witnesses to the effect that appellant had assaulted and beaten the deceased on numerous occasions we do not think the statement of the county attorney could have been prejudicial.

Another instance of alleged misconduct of the county attorney is that in referring to the evidence of Mae Adams he said: "Take the time that Mae Adams was there, and he knocked her (deceased) across the bed and her head hit the floor." Counsel for appellant objected to the statement of the county attorney insofar as he said that her head "hit the floor," and the court admonished the jury to remember the testimony for themselves as it was given by the witness from the witness' stand. Again the county attorney was in error in his statement that the witness said that her head "hit the floor." The exact language of the witness was that he knocked her over the bed "in the floor." This court has often condemned the practice of attorneys

arguing matters to the jury not in the record, or misquoting the evidence of witnesses, but whether or not a misstatement of counsel or misquotation of evidence is prejudicial depends upon the nature and circumstances of the case. We do not think that the statement of the county attorney, alhough improper, was prejudicial. It is hardly reasonable to believe in the circumstances that the jury would have returned a different verdict but for this misstatement of the county attorney.

The further complaint is that in the course of his argument to the jury the county attorney further said:

"Gentlemen, if you can figure out some manner in which Edith Long, or any other person, could have fallen down and gotten these bruises, the hemorrhages, this fracture, this condition in her throat where he choked her, these many bruises on all sides of her body, and then I say you should turn James Pulliam loose and tell him to go and get another woman and beat her to death and come back up here and tell me that you didn't do it and I will turn you loose."

The court overruled objections to the above statement. The county attorney made further remarks of a like or similar nature to the effect that Edith Long is lying in her grave and appellant is free, etc. In Shepherd v. Commonwealth, 236 Ky. 290, 33 S. W. (2d) 4, 6, in discussing a similar question, the court said:

"In the zeal of advocacy, heated remarks are not unusual, and some allowance must be made for the common sense and fair judgment of the jurors. Cooksey v. Commonwealth, 235 Ky. 454, 31 S. W. (2d) 703. If an attorney in his argument departs from the record and refers to matters not proper for the consideration of the jury, and which are reasonably calculated to inflame animus against the accused, the court may be compelled to interpose to prevent a miscarriage of justice. But we see no merit in the complaint now presented, and are convinced that the casual comment of the commonwealth's attorney played no part in the conviction of the appellant. In such cases, it is held that no prejudice to the defendant is apparent, even when it is conceded that the comment was improper. Collins v. Commonwealth, 218 Ky. 189, 291 S. W. 1; Hudson v. Commonwealth, 227 Ky. 831, 14 S. W. (2d) 146; Mullins v. Commonwealth, 230 Ky. 624, 20 S. W. (2d) 442; Moore v.

Commonwealth 223 Ky. (128), 133, 3 S. W. (2d) 190; Johnson v. Commonwealth, 225 Ky. 413, 416, 9 S. W. (2d) 53; Ratcliffe v. Commonwealth, 231 Ky. 337, 21 S. W. (2d) 441.''

Conceding that certain parts of the argument was technically improper, yet we do not think it was prejudicial.

The last complaint is that the evidence of Louis LeCompte, the undertaker, was incompetent because he was not a licensed practicing physician. We are cited to no authority holding that a licensed undertaker, embalmer and funeral director, such as Mr. LeCompte, is incompetent to testify concerning the nature of wounds or other conditions of the human body. To engage in such business or profession requires a study and practical knowledge of the anatomy and structure of the human body. KRS 316.030, subsections 2 and 3. However, even a lay witness is competent to testify as to wounds and external conditions of the human body. Furthermore, most of LeCompte's evidence was along the same line as that of Dr. Barr, who is a licensed practicing physician, and if it be conceded that LeCompte was incompetent to testify independently concerning the conditions discovered himself, since it is shown by the evidence of Dr. Barr and Dr. Miller, as well as LeCompte, that the proximate cause of decedent's death was the fracture of the skull, LeCompte's evidence as to the other conditions could not have been prejudicial. Utley v. Pence, 295 Ky. 673, 175 S. W. (2d) 372, 373. We find no error prejudicial to appellant's substantial rights.

Judgment affirmed.