# Brandenburg v. Commonwealth.

(Decided June 14, 1935.)

SAWYER A. SMITH, S. H. RICE and ROSE & STAMPER for appellant.

BAILEY P. WOOTTON, Attorney General, and RAY L. MURPHY, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Between 9 and 9:30 o'clock on the evening of July 4, 1934, Patrick Kilkarney was shot and killed on the streets of Booneville, Ky., the weapon (a pistol) with which the shooting was done being in the hands of appellant and defendant below, Elmer Brandenburg. He was later indicted by the grand jury of Owsley county charged with murder, and at his trial he was convicted of voluntary manslaughter and punished by the maximum term of imprisonment for that offense. From the judgment pronounced on that verdict, after his motion for a new trial was overruled, he prosecutes this appeal, and by his counsel urges but two grounds for reversal, which are: (1) Incompetent evidence introduced by the commonwealth over his objections and exceptions; and (2) error in giving and refusing to give instructions. Before taking them up for determination, we deem it necessary for an understanding of the case to make a brief statement of the facts developed by the testimony.

On the fatal evening, the National Independence day was being celebrated by the explosion of firecrackers in the town of Booneville, and quite a number of people were on its streets, having been attracted there because of the festivities. At a prominent corner in the town was a grocery store, and opposite to it a bank was located and next to the bank was a barbershop. Between the grocery building and the barbershop an automobile had stopped at a place in the street slightly towards the grocery building from the center of the way. It was equipped with a rumble seat, in which sat Douglas Gabbard and Mrs. Corba Garrett; the former occupying the left end of the seat and the latter its right end. The other two occupants of the car were on the front seat, with Lee Hurt at the wheel. Just immediately preceding the homicide, defendant started from some part of the grocery building somewhat diagonally across the street and near to the standing automobile. He spoke to some or all of its occupants, and hesitated by the side of the rumble seat occupied by Douglas Gabbard to speak a few words to him. While he was thus engaged, Ott Gabbard appeared and remarked that he wished to hve a few words with Douglas. He put one foot upon the left end of the rear bumper of the automobile with one of his arms or elbows on the end of the rumble seat where Douglas Gabbard was sitting, and engaged in a conversation with him and Mrs. Garrett sitting by his side. In the meantime, appellant had retired or passed to the rear of the automobile, and was not thereafter observed by the occupants of the car.

There is some conflict in the testimony as to whether or not at the immediate time firecrackers were being exploded on the streets, but they had theretofore been exploded, and some of the witnesses say that the firing of them had not ceased at the time of the shooting, while others testified to the contrary. But the fact, as we conclude, is immaterial the one way or the other. At any rate, within the space of a minute or two after defendant had moved his position from the left end of the rumble seat to the rear of the car, a loud explosion was heard by the bystanders, which was immediately followed by an exclamation from Mrs. Kilkarney, which was phrased differently by the witnesses who heard and testified to it, but which in substance was the same, and as given by one witness it was: "Help men, do every-

thing you can. Elmer Brandenburg has killed Pat.''
Other witnesses testified that she exclaimed: ''Elmer
Brandenburg has killed Pat.'' They all say that such
exclamation by her was not farther removed from the
loud explosion that the witnesses heard than from one
to three seconds. About the time defendant changed his
position from talking with Douglas Gabbard as above
described to the rear of the automobile (or his passing
in that direction), Mr. and Mrs. Kilkarney started
across the street, from the side where the store building
was located, towards the barbershop on the other side
and passed to the rear of the automobile. Mrs. Kil-
karney was holding to the left arm of her husband,
who was a large, fleshy man, while the wife was a small
delicate woman. He was slightly in advance of his
wife, and the bullet that killed him passed immediately
in front of Mrs. Kilkarney, and she testified that she
felt a quivering sensation from her husband's body and
she immediately made the exclamation referred to,
which caused a quick gathering of people around her
husband, and some of them assisted him to the walk at
a point near the line between the bank and the barber-
shop, where there was a stairway leading to the second
story, at which point he gave way and was let down
upon the sidewalk, where he soon expired.

Defendant was one of the crowd that gathered
around him and assisted him to the sidewalk. While
there, and before departing therefrom, he relieved him-
self of his pistol, which was later found under some of
the lower steps of the stairway. Mrs. Kilkarney, as
did the other witnesses, testified that it was somewhat
dark in the immediate surroundings, there being no
street lights burning at the time, and the light that was
furnished was from automobiles, but they were not
sufficiently plentiful to completely drive away the dark-
ness. Immediately upon the firing of the fatal shot,
she turned her head to the left from whence the deadly
bullet came and saw defendant some distance from the
rear of the automobile, and which caused her to believe
that the shot was fired by him; hence her immediate
exclamation.

The prosecution proved, and it was admitted by
defendant that, commencing the night before he had
been steadily drinking and had slept off his stupor at
a friend's house on that afternoon. Upon being aroused

from his slumbers he went into the kitchen of his friend and procured his supper, following which he went to town carrying his pistol, and later went into a restaurant and perhaps a beer joint, where he consumed some beer, but the record does not disclose to what extent. While in the restaurant he stated in the presence of witnesses that he was armed with a pistol, some of whom felt it under his clothing. A number of witnesses testified to his having a pistol throughout the day and night, and which fact he admitted at the trial. Mrs. Seale, the wife of the storekeeper, the location of whose business is above referred to and at whose house defendant took his afternoon nap and ate his supper, testified that while he was at her house he told her that on the preceding night he had some trouble with unnamed parties, and that "he was going to blow some of them up, and she asked him if he had a pistol and he said 'yes'." She requested him to turn it over to her, but he refused. Another witness testified that some six months, perhaps, before the shooting defendant told her that the deceased had "treated him dirty" about some trifling business transaction, but that he made no threats, and we are not inclined to attach much importance to the incident. ,

Defendant testified to facts indisputably showing that it was the shot from his pistol that killed Kilkarney. He said that as Ott Gabbard came up to the automobile referred to he (defendant) retired slightly to its rear and firecrackers were being exploded, and he, having none, concluded he would join in the celebration, and drew his pistol with the intention of firing it into the ground, when Ott Gabbard grabbed his arm and jerked it upwards, so that when his pistol fired its load went down the street into the semi or complete darkness, where he saw no one, although Mrs. Kilkarney and other witnesses show that the spot where the deceased and his wife were located at the time the former was shot was but a short distance from the rear of the automobile. Ott Gabbard was dead at the time of the trial, but every one who was in the automobile testified that none of them fired any weapon on that occasion, and the two who occupied the rumble seat, at the left end of which stood Ott Gabbard, testified that he did not change his position just preceding the shooting, and that he made no effort to grab at anything after he

arrived and before the shot was fired, either to the rear of the automobile or elsewhere. Defendant was uncorroborated by any witness as to his claim of unintentional or accidental shooting occurring in the manner he described.

Returning now to the urged grounds supra, it is argued in support of ground 1 that the exclamation of Mrs. Kilkarney was inadmissible under the res gestæ doctrine, because it was made by a bystander who was not engaged, or participating in or connected with, the principal transaction, which in this case was the homicide; nor from one personally "concerned in the act of killing." As stated by some courts, the exclamation was not made by a "party to the occurrence." In support of that contention the cases of, Bradshaw v. Commonwealth, 10 Bush, 576; Kaelin v. Commonwealth, 84 Ky. 354, 1 S. W. 594, 8 Ky. Law Rep. 293; Werner v. Commonwealth, 80 Ky. 387; Riggs v. Commonwealth, 33 S. W. 413, 17 Ky. Law Rep. 1015, 1018; Selby v. Commonwealth, 80 S. W. 221, 25 Ky. Law Rep. 2209, 2210; Louisville Ry. Co. v. Johnson's Adm'r, 131 Ky. 277, 115 S. W. 207, 20 L. R. A. (N. S.) 133; Louisville & N. R. R. Co. v. Sinclair, 171 Ky. 562, 569, 188 S. W. 648; and Logan & Tribble v. Commonwealth, 174 Ky. 80, 88, 191 S. W. 676, are cited and relied on. They appear to uphold the contention of counsel, although there are other cases from this jurisdiction sustaining the introduction of res gestæ exclamations made by bystanders. The two lines of cases appear to be directly antagonistic; but for the reasons hereinafter stated we will not attempt to reconcile them, nor will we undertake to now declare what we conceive to be the correct rule, further than to say that the fundamental basis for the admission of res gestæ exclamations is, that they are spontaneously made within such quick succession to the happening of the principal transaction as to not afford an opportunity for falsification in order to accomplish some sinister design, and which conclusion, lying at the foundation of the rule, is bottomed upon the idea that the first impulse of humanity is to speak the truth, and that such utterances made before sufficient time for reflection can be usually depended upon as truthful. That reason for the promulgation of the rule takes the place of an oath by the exclaimer,

as does the immediate pending of death take the place of one by the maker of a dying declaration.

The logical conclusion, therefore, would appear to be that any exclamation made under the outlined circumstances would be embraced by the rule. However, as we have said, it is not necessary for the purposes of this case to further elaborate the question, and it will be passed without further comment, since, conceding that the proof of the exclamation of Mrs. Kilkarney was incompetent because made by a bystander instead of a victim, then it was clearly nonprejudicial under the facts of this case, as we will now proceed to point out.

Res gestæ expressions are received as substantive testimony to be weighed and given effect where the exclaimer does not appear as a witness and himself confirm the exclamation. Mrs. Kilkarney testified in this case, not only to her proven exclamation, but likewise to other facts and circumstances, including the surroundings and other matters above recited. The witnesses, therefore, who testified to her exclamation, did nothing more than repeat what she stated in her testimony, and, because of that fact, no logical reason is or can be advanced whereby any prejudicial effect can flow from the criticized testimony. Moreover, and as an additional reason why that testimony was immaterial, is the fact that the objected to exclamation stated only that defendant had shot and killed the deceased, and he in his testimony substantially admitted that fact, but sought to excuse it on the ground that it was accidentally brought about in the manner hereinbefore outlined. Therefore the exclamation contained no fact that the defendant controverts, and for which reason also the complained of error, even if one, could not possibly operate to the prejudice of defendant. The reasons we have given why such testimony could not be regarded as prejudicial, conceding it to be incompetent, are so conclusive as to require the citation of no authority in support of them, but similar situations appeared and were similarly disposed of in the cases of Tester v. Commonwealth, 229 Ky. 403, 17 S. W. (2d) 260, Marcum v. Commonwealth, 201 Ky. 527, 257 S. W. 714, and Barton v. Commonwealth, 247 Ky. 133, 56 S. W. (2d) 715. It is therefore our conclusion that ground 1 is unavailing.

The court properly instructed the jury on murder; voluntary manslaughter by reckless handling of firearms; involuntary manslaughter produced by unintentional shooting with careless handling of firearms; and accidental killing if it was done under crcumstances not embraced by either of those instructions, and with no intention on the part of defendant to do personal harm to any one, in which event the jury was told that he should be excused on the ground of accidental shooting. The only instruction that counsel criticize is the one submitting the defense of accidental shooting, and the only objection he directs towards it, having any semblance of materiality, is that it failed to specifically and expressly incorporate the facts which defendant claimed produced his accidental shot. The facts were fresh in the minds of the jury, and its members would be stupid indeed if they could not and did not comprehend the facts upon which the accidental shooting claim was based.

The testimony as a whole is quite convincing that defendant, in the condition in which he had voluntarily put himself, was in a reckless mood, and concluded to join in the fireworks festivities of the occasion with the only instrument at his command, which was his pistol, and that he recklessly shot down the street with such gross carelessness as to make him criminally liable for what happened and to make his resultant act of homicide voluntary manslaughter under numerous opinions of this court, and which was the offense for which he was convicted. We are impressed that the punishment inflicted was rather exorbitant, but that was a matter exclusively for the jury to fix within the limitations of the law, and is one which we are powerless to correct. That authority rests with another department of the state government, and is entirely without our jurisdiction.

Having so concluded, it follows that none of the grounds urged for reversal are sufficient for that purpose, and the judgment is affirmed.