## Pennington v. Commonwealth.

May 11, 1943.

William Lewis & Son and J. H. Asher for appellant.

Hubert Meredith, Attorney General, and W. Owen Keller, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

Raleigh Pennington has been convicted of the crime of murder and his punishment fixed at imprisonment for

life. The only grounds relied upon for reversal of the judgment are: (1) Alleged error of the court in overruling the appellant's motion to set aside the swearing of the jury and continue the case made at the conclusion of the evidence for the Commonwealth when it was discovered that a deputy sheriff who was hostile to appellant had assisted in summoning the jury; and (2) alleged error in the admission of evidence. There is no claim that the evidence was not amply sufficient to sustain the verdict, but a discussion of ground 2 requires a brief resume of the facts.

Elhanan Turner was shot and killed at a lumber camp on White Oak creek on Sunday, April 6, 1940. The buildings in the camp were a blacksmith shop, a boarding house, and what is referred to in the record as a "bunkhouse." A few days before the killing Turner, whose home was about one-fourth mile from the camp, had purchased a truck and about 10 o'clock on Sunday morning he, Frank Jewett, and Emmitt Lunsford were measuring the truck for the purpose of having a bed made for it when the report from a shotgun was heard. Turner was standing between Jewett and Lunsford, and the load of shot struck him in the back of his head, his neck and shoulder. The truck was parked in the road near the blacksmith shop about 100 feet from the bunkhouse. J. G. Bracken and Jay Coffey were standing about 150 feet from the truck. Bracken heard a noise like an explosion, looked toward the truck, and saw Lunsford jump and run toward the bunkhouse and saw Jewett run behind the blacksmith shop. Turner, when he first saw him, "was lent up right behind the shop and he stopped and made a circle again and went around behind the bunkhouse." The witness saw smoke after the shot was fired, but did not see who fired it. He followed Turner into the bunkhouse and found him leaning against a bed. He assisted him onto the bed and placed a pillow under his head. Turner lived 25 to 40 minutes after he was shot. Frank Jewett testified that he was standing beside the truck on the left side of Turner, and assisting the latter in making the measurements when the shot was fired. Emmitt Lunsford was on Turner's right and two or three shots struck him in the hand. Jewett saw no one at the time except Bracken and Coffey, who were standing a short distance away. He saw smoke about 10 feet from the place where he and Turner were standing, and the person who fired the shot was behind either the

blacksmith shop or some laurel bushes across the road. Polly Jane Turner lives about 100 yards from the lumber camp. Appellant stopped at her home about 10 o'clock and asked her where Elhanan Turner lived. He was carrying a shotgun. After he left she went to a store and learned of the shooting when she returned. On Sunday before the shooting appellant was at the home of Art Boggs. Mrs. Boggs testified that appellant said in her presence "he had been taught about Elhanan Turner killing his daddy, and he believed he could kill Elhanan and be turned loose." Art Boggs' testimony was substantially the same. It appears that about fifteen years previously Turner had been indicted for the killing of Matt Pennington, father of appellant, but the indictment had been dismissed. Felix North saw appellant about noon on the day of the shooting. Appellant had a shotgun and, according to the witness, said that "he went up to the upper camp and Elhanan and another man were working under the bottom of a truck and stooped down and he shot him." There was proof of other incriminating statements made by appellant both before and after the shooting. Appellant attempted to make out a case of self-defense. He testified, in substance, that he lived with his mother about 12 miles from the home of Elhanan Turner. He spent Saturday night at the home of Eli Pennington, a distant relative, and on Sunday morning borrowed Eli's shotgun intending to go squirrel hunting. He walked along the road to the lumber camp and as he passed the blacksmith shop Turner was stooped down at the truck. Turner saw him and raised up. Appellant was asked what happened then, and answered:

"He jerked his gun as he got up and then I jerked my gun and shot him and he turned his right shoulder."

According to the proof for the Commonwealth, Turner was unarmed.

The first ground relied upon by appellant is wholly without merit. By agreement of the Commonwealth and appellant the case was tried by a jury summoned from Perry county. Owen Sizemore, sheriff of Leslie county, accompanied by Wiley Joseph, a deputy sheriff, went to Perry county and, assisted by the sheriff of Perry county or someone connected with the sheriff's office, summoned the special venire. Sizemore testified that he summoned the prospective jurors, and that Joseph was present and

wrote down the names. On the voir dire examination some of the jurors stated they were summoned by Sizemore, some by Joseph, and some by Cornett, the sheriff of Perry county. At the conclusion of the Commonwealth's evidence the defendant moved to discharge the jury and continue the case because Wiley Joseph, deputy sheriff of Leslie county, went to Perry county and assisted in summoning the jurors. In his affidavit in support of the motion he stated that Joseph had shot at him on one occasion, was hostile to him, and had said to him on several occasions "that he was going to do everything he could against him in the prosecution of the case." The proof taken on the motion out of the hearing of the jury failed to show that Joseph had anything to do with selecting or summoning the jurors, but aside from that appellant was aware of all the facts before the jury was sworn and he should have made his motion then and not after the Commonwealth had introduced its evidence.

The alleged incompetent evidence admitted over appellant's objection was a statement made by the deceased to J. G. Bracken shortly after the shooting. Bracken testified that he followed Turner into the bunkhouse immediately after the shooting and was with him until he died a few minutes later. He was asked if he heard any statement made by Turner after the shooting and before Turner died, and, out of the presence of the jury, the witness said in part:

> "After he came in the bunkhouse he kindly fallen off of the bed and looked like he was getting weak or something and I took hold of him and sorty stretched him out on the bed and laid his head on the pillow and he looked up and called me and he asked for his wife and I told him the boy was gone after her, and said she will be here just in a minute and I told him to be quiet and he said who shot me and I said, I don't know * * *."

The court permitted the statement "who shot me" to go to the jury not as a dying declaration but apparently on the theory that it was part of the res gestae. The Commonwealth failed to qualify the statement as a dying declaration, but we think it was admissible under the circumstances as part of the res gestae. Turner had been shot in the back of the head, and his wounds proved fatal within a few minutes. Ed Boggs said that he found sixty shots in Turner's right shoulder blade, his neck

and the back of his head. It is apparent that he suffered severe shock, and the statement complained of was not the result of premeditation and design.

The res gestae rule is an exception to the hearsay rule, and the basis for the admission of statements under the rule is that they are presumed to be true if made spontaneously at the time of a specific event and under such circumstances as to show lack of premeditation or deliberate design in the formulation of their content. The lapse of time between the event and the declaration is not always controlling. The interval must be sufficiently short to preclude an opportunity for formulation of statements favorable to the declarant's cause, but the factual situation in each case will control the court's decision. For example, a person is rendered unconscious by a blow and remains unconscious for a considerable time. A statement made by him immediately upon regaining consciousness is part of the res gestae and admissible if it conforms to the rule in other respects. Deacon v. Commonwealth, 162 Ky. 188, 172 S. W. 121. In National Life & Accident Insurance Company v. Hedges, 233 Ky. 840, 27 S. W. (2d) 422, 425, it was said:

> "The principle deducible from the authorities is that statements of the injured party, accompanying the transaction, and made under such circumstances as will raise a reasonable presumption that the declarations are the spontaneous utterances of thoughts springing out of the transaction itself and made so soon thereafter as to exclude the presumption of design, constitute competent testimony. Spontaneity, as distinguished from a mere matter of time, has come to be considered the determining factor."

To the same effect are Brandenburg v. Commonwealth, 260 Ky. 70, 83 S. W. (2d) 862; Stewart v. Commonwealth, 235 Ky. 670, 32 S. W. (2d) 29; Sparks Bus Line v. Spears, 276 Ky. 600, 124 S. W. (2d) 1031; Consolidated Coach Company v. Earl's Adm'r, 263 Ky. 814, 94 S. W. (2d) 6; Norton's Adm'r v. Winstead, 218 Ky. 488, 291 S. W. 723.

Here the deceased made the statement objected to by appellant after he had been mortally wounded, while he was "laboring under the stress of the misfortune," before there was time for reflection and without oppor-

tunity to design or contrive anything to his advantage. Under the circumstances, the statement was admissible. The proof shows that appellant was guilty of murder, committed in the most cowardly fashion. The jury in assessing the punishment was as lenient as the facts and the law permitted.

The judgment is affirmed.